# United States Court of Appeals

## For the First Circuit

———————————

No. 99-1789

NILSA SANTIAGO-RAMOS,

Plaintiff, Appellant,

v.

CENTENNIAL P.R. WIRELESS CORP.;
ABC INSURANCE CO.,

Defendants, Appellees.

———————————

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Salvador E. Casellas, U.S. District Judge]
[Hon. Jesús A. Castellanos, U.S. Magistrate Judge]

———————————

Before

Torruella, Chief Judge,

Campbell and Wallace,* Senior Circuit Judges.

———————————

Judith Berkan, with whom Mary Jo Méndez and Berkan/Méndez were on brief, for appellant.
Marshal D. Morgan, with whom Edwin J. Seda-Fernández, Isabel Abislaiman and Axtmayer Adsuar Muñiz & Goyco, P.S.C. were on brief, for appellee Centennial P.R. Wireless Corp.

———————————

July 6, 2000

———————————

————————————————

* Of the Ninth Circuit, sitting by designation.

**WALLACE**, **Circuit Judge**.  Nilsa Santiago-Ramos sued her former employer, Centennial P.R. Wireless Corporation (Centennial), for sex discrimination and retaliation pursuant to Title VII of the 1964 Civil Rights Act, 28 U.S.C. § 2000e et seq. (Title VII), and for violations of Puerto Rico law.  A magistrate judge, sitting by consent of the parties, entered summary judgment for Centennial.  The district court exercised jurisdiction pursuant to 28 U.S.C. § 1331, and we have jurisdiction over this timely appeal pursuant to 28 U.S.C. § 1291.  We affirm in part, reverse in part, and remand.

**I**

Our review of the record is in a light most favorable to the party opposing summary judgment.  Dávila-Pérez v. Lockheed Martin Corp., 202 F.3d 464, 466 (1st Cir. 2000).

Centennial, a subsidiary of New Jersey-based Centennial Cellular Corp. (parent company), is a telecommunications business that began operations in Puerto Rico in early 1996.  Amaury Rivera, Centennial's vice president and general manager, and Thomas Bucks, chief financial officer and comptroller of the parent company, interviewed Santiago-Ramos for a position as Centennial's director of finance and administration.  Rivera gave Santiago-Ramos a written job offer dated June 12, 1996, which she accepted and returned as requested.  Santiago-Ramos was chosen over two male applicants and received several work assignments before formally beginning work on July 1, 1996.  She also signed a 90-day

probationary contract dated July 1, but she disputes that the probationary contract is valid.

Santiago-Ramos was the only female among Centennial's four high-level executives. She was responsible for Centennial's finance, certain personnel matters (including oversight responsibility for the drafting and implementation of an employee manual), and some inventory assignments. Because Centennial was beginning operations in Puerto Rico, all employees' responsibilities were somewhat fluid and all were expected to work more than the normal 40-hour work week. Santiago-Ramos reported directly to Rivera in Puerto Rico and to Bucks at the parent company. Phil Mayberry, the parent company's senior vice president for Puerto Rico operations, was Rivera's direct supervisor and oversaw all Puerto Rico operations from his parent company office.

At the time she worked for Centennial, Santiago-Ramos had one child and planned to have another child within several years. After beginning work, she was directly asked about her ability to balance work and family obligations. In one instance, Rivera asked Santiago-Ramos whether it was possible for her to handle simultaneously her job, child care, and marital responsibilities. Several times, he questioned how her husband was managing, considering she was not home to cook for him. The questions were not asked only by Rivera: two weeks before she was dismissed, Mayberry asked Santiago-Ramos how well her work was proceeding in light of her child. She responded that her work was going well and that she planned to have a second child within several years.

Mayberry stated that having another child was a lot of work, and he questioned whether Santiago-Ramos could perform her job effectively after having a second child. She responded that she would be able to meet both work and family obligations. Santiago-Ramos sensed that Mayberry disliked her response.

Another incident directly involved Santiago-Ramos, Rivera, and Mayberry. During Santiago-Ramos' tenure at Centennial, the company planned a major job fair at which a large number of employees would be hired. In preparation for the event, Rivera met with Santiago-Ramos and an advertising consultant. Rivera discussed a profile he drafted identifying the people the company was and was not interested in hiring. The profile purportedly excluded from consideration as Centennial employees older persons with heavy non-work commitments, married women, and women with children. Rivera told Santiago-Ramos that the profile was "nothing personal against you," but that he preferred unmarried, childless women because they would give 150% to the job. Later in this meeting, Rivera telephoned Mayberry, read the profile to him, and Mayberry approved it. Santiago-Ramos told Rivera that she opposed the profile, stating it was discriminatory. However, she never reported her objection to Mayberry or any other parent company representative. She did not actually see the profile, and questions regarding marriage and children were not included on the interview questionnaire used at the job fair.

Nor were these the only comments made by Rivera and Mayberry concerning women employees and pregnancy. For instance,

Rivera allowed Santiago-Ramos to choose his new secretary. Santiago-Ramos hired Toni Mejías, a mother of two. When Rivera later discovered that Mejías had two children, he questioned Santiago-Ramos about whether her choice was a good one. On another occasion, Mayberry and a number of employees from the parent company visited Puerto Rico to assist in the Centennial job fair. Upon noticing that Santiago-Ramos was speaking with another female employee, Mayberry called out to nearby male employees, "guys watch out with the females, next thing we know they will be running the company." Also, Mejías heard Mayberry state that he did not like women with children working at Centennial. Other evidence puts Mayberry's comments in perspective: Bucks testified in a deposition that it did not surprise him that Mayberry questioned whether women with children could fulfill work responsibilities, and Rivera referred to Mayberry as a "big time machista."

Mayberry and Rivera were not the only Centennial and parent company employees who made comments about women, work, and children. We relate several instances by way of illustration. Two employees in Santiago-Ramos' department stated that a secretary at Centennial who was on maternity leave should not have become pregnant so soon after joining the company and that she would most likely be fired as a result. These same employees told Santiago-Ramos and Mejías separately that they should not get pregnant or they would be fired. On a trip Santiago-Ramos took for training at the parent company, one of the parent company's directors complained to Santiago-Ramos that his secretary stopped working

late after having children, and "that is what happens when we hire females in the child-bearing years." A parent company employee, who came to Puerto Rico to assist with the job fair, told Santiago-Ramos that he was "in the interviewing mood," and asked her in front of a number of other employees how long she had been married, how many children she had, and what their ages were.

During her three months' employment at Centennial, several problems occurred that Centennial, at least partially, attributes to her. First, when a shipment of 500 telephones crucial to Centennial's telecommunications operations arrived, five telephones, with a combined value of $2000, were missing. Santiago-Ramos had inventory responsibility over this shipment, and that these units were missing was not discovered until several days after the telephones arrived. Second, Centennial incurred demurrage charges on a shipment containing communications towers because they were picked up at the San Juan docks late. However, Santiago-Ramos denies that she was responsible for ensuring that the towers were properly received. Third, electrical service was cut off at several Centennial locations because utility bills were unpaid. Santiago-Ramos was responsible to pay these bills, and Centennial bore reconnect charges to restore power. Fourth, the Centennial employee manual, over which Santiago-Ramos had ultimate oversight responsibility, was not completed during her employment.

Because Centennial was a start-up company, its employees were under constant evaluation. Nevertheless, neither Bucks nor Rivera ever told Santiago-Ramos that her work was unsatisfactory.

-6-

When Santiago-Ramos came to the parent company for training two weeks before her dismissal, Mayberry stated that he had no intention of firing her. Rivera reported that up to the day Mayberry instructed him to do so, he also had no intention of firing her.

On September 27, 1996, Santiago-Ramos' 89th day of employment with Centennial, Mayberry told Rivera to dismiss her. Rivera did so without providing Santiago-Ramos an explanation. The events leading up to that decision are not entirely clear. For instance, Bucks testified in his deposition that he, Rivera, and Mayberry jointly discussed Santiago-Ramos' employment during the preceding week and collectively agreed that her employment should be terminated. Mayberry stated that he discussed firing Santiago-Ramos and his rationale for doing so several times with Rivera. However, Rivera recalls only one conversation, held the day Mayberry told him to fire Santiago-Ramos. The record contains a memorandum Rivera wrote dated September 27, 1996, stating that Santiago-Ramos was dismissed and identifying four reasons for doing so; however, Mejías, who typed the memorandum from Rivera's dictation, testified in a deposition that the memorandum was not prepared on September 27, and was only written after Santiago-Ramos initiated legal proceedings against Centennial. It is clear, however, that Santiago-Ramos' responsibilities were assumed by other employees.

Santiago-Ramos filed this action and, after extensive discovery, Centennial moved for summary judgment. Santiago-Ramos

moved for partial summary judgment on several of her Puerto Rico law claims. The magistrate judge granted Centennial's motion for summary judgment, denied Santiago-Ramos' motion for partial summary judgment, refused to exercise supplemental jurisdiction over the Puerto Rico law claims, and entered judgment for Centennial.

**II**

The parties dispute whether the magistrate judge properly applied the summary judgment standard. "We review summary judgment de novo, viewing the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." Dávila-Pérez, 202 F.3d at 466 (internal quotations and citations omitted). Summary judgment is appropriate only if "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party. A fact is material if it carries with it the potential to affect the outcome of the suit under the applicable law." Sánchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996) (internal quotations and citations omitted).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "Once the

-8-

moving party has properly supported [its] motion for summary judgment, the burden shifts to the nonmoving party, with respect to each issue on which [it] has the burden of proof, to demonstrate that a trier of fact reasonably could find in [its] favor." DeNovellis v. Shalala, 124 F.3d 298, 306 (1st Cir. 1997), citing Celotex, 477 U.S. at 322-25. In opposing summary judgment, the nonmoving party "may not rest upon the mere allegations or denials of [the] pleading, but must set forth specific facts showing that there is a genuine issue" of material fact as to each issue upon which he or she would bear the ultimate burden of proof at trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986) (internal quotations, citation, and alteration omitted).

We address one other issue before the merits. Santiago-Ramos filed a sworn affidavit, in addition to documentary evidence and transcripts of portions of depositions, in her opposition to Centennial's motion for summary judgment. Santiago-Ramos cited her affidavit frequently in her argument. Both Centennial and the magistrate judge fault her for doing so, stating that the self-serving statements, produced after her receipt of Centennial's summary judgment motion, should be given less credibility than other evidence in the record. Centennial cites Wright and Miller, Federal Practice and Procedure §§ 2722, 2738 (1998), for the proposition that judges should afford less weight to affidavits than to deposition testimony when deciding summary judgment motions. Santiago-Ramos relies on Federal Rule of Civil

-9-

Procedure 56, which states that affidavits may be used in supporting and opposing motions for summary judgment.

The law regarding this dispute is clear. To the extent that affidavits submitted in opposition to a motion for summary judgment merely reiterate allegations made in the complaint, without providing specific factual information made on the basis of personal knowledge, they are insufficient. Roslindale Coop. Bank v. Greenwald, 638 F.2d 258, 261 (1st Cir. 1981), citing Fed. R. Civ. P. 56(e). However, a "party's own affidavit, containing relevant information of which he has first-hand knowledge, may be self-serving, but it is nonetheless competent to support or defeat summary judgment." Cadle Co. v. Hayes, 116 F.3d 957, 961 n.5 (1st Cir. 1997), citing Nereida-González v. Tirado-Delgado, 990 F.2d 701, 706 (1st Cir. 1993). Santiago-Ramos' affidavit contains more than the allegations made in her complaint: it provides specific factual information based upon her personal knowledge. It may be self-serving, but it complies with the requirements of the federal rules, and we therefore must consider it together with the other evidence before the magistrate judge.

**III**

The first issue is whether the magistrate judge erred in granting summary judgment to Centennial on Santiago-Ramos' sex discrimination claim. Title VII makes it "an unlawful employment practice for an employer . . . to discharge any individual . . . because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). If the employer's decision is made "because of or

-10-

on the basis of pregnancy, childbirth, or related medical conditions," it is made "because of sex." Id. § 2000e(k). A Title VII sex discrimination claim may be proven with direct evidence of discrimination, such as "an admission by the employer that it explicitly took actual or anticipated pregnancy into account in reaching an employment decision." Smith v. Morse & Co., 76 F.3d 413, 421 (1st Cir. 1996). Such "smoking gun" evidence is rare, but sex discrimination may also be proven with circumstantial evidence. Domínguez-Cruz v. Suttle Caribe, Inc., 202 F.3d 424, 428-29 (1st Cir. 2000).

When considering circumstantial evidence of sex discrimination, we apply a three-stage, burden-shifting framework that was first articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and further delineated in Texas Department of Community Affairs v. Burdine, 450 U.S. 248 (1981), and St. Mary's Honor Center v. Hicks, 509 U.S. 502 (1993). The analysis "is intended progressively to sharpen the inquiry into the elusive factual question of intentional discrimination." Burdine, 450 U.S. at 255 n.8.

**1.**

An employee alleging sex discrimination must first establish a prima facie case by showing that: (1) she belonged to a protected class, (2) she performed her job satisfactorily, (3) her employer took an adverse employment decision against her, and (4) her employer continued to have her duties performed by a comparably qualified person. Smith, 76 F.3d at 421. This task "is

-11-

not onerous," Burdine, 450 U.S. at 253, and can result in a rebuttable presumption "that the employer unlawfully discriminated against the employee." Id. at 254.

Three elements of Santiago-Ramos' prima facie case are clearly met: she is a woman; she was fired; and comparable persons continued to perform her work responsibilities. Whether Santiago-Ramos performed her job satisfactorily at Centennial is not as clear. However, we need not reach this issue because of our second inquiry.

**2.**

At the second stage, the burden shifts to the employer to state a legitimate, nondiscriminatory reason for the adverse employment action. Hicks, 509 U.S. at 506-07. The employer's burden is merely a burden of production; the employee maintains the burden of proof throughout. Id. at 507. If the employer meets its burden, the presumption of discrimination evaporates. Id.

Centennial advanced the following nondiscriminatory reasons for firing Santiago-Ramos: (1) the missing phones incident; (2) the communications towers demurrage charges; (3) the unpaid electrical bills; (4) failure to complete the employee manual; (5) her general attitude and lack of commitment. Santiago-Ramos concedes that these reasons are sufficient to drop the inference of discrimination that she contends arose from the first step.

**3.**

At the third stage, with the initial presumption of discrimination removed, it falls upon the employee to "present sufficient evidence to show both that the employer's articulated reason . . . is a pretext and that the true reason is discriminatory." Thomas v. Eastman Kodak Co., 183 F.3d 38, 56 (1st Cir. 1999), cert. denied, 120 S. Ct. 1174 (2000) (internal quotations and citations omitted). "Plaintiffs may use the same evidence to support both conclusions, provided that the evidence is adequate to enable a rational factfinder reasonably to infer that unlawful discrimination was a determinative factor in the adverse employment action." Id. at 57 (internal quotations and citations omitted).

We must decide "whether, viewing the aggregate package of proof offered by [Santiago-Ramos] and taking all inferences in [her] favor, [Santiago-Ramos] has raised a genuine issue of fact as to whether the termination was motivated by [sex] discrimination." Domínguez-Cruz, 202 F.3d at 431 (citations and quotations omitted). If there is sufficient evidence in the record from which a jury could infer that Centennial's proffered reasons for firing Santiago-Ramos were pretextual and that it made its decision because of discriminatory animus, summary judgment is inappropriate. See id. We first address whether evidence of pretext exists, having in mind that courts should exercise particular caution before granting summary judgment for employers

-13-

on such issues as pretext, motive, and intent.  Hodgens v. General Dynamics Corp., 144 F.3d 151, 167 (1st Cir. 1998).

Santiago-Ramos can establish that Centennial's stated reasons for her dismissal are a pretext for discrimination in a number of ways.  One method is to show that discriminatory comments were made by the key decisionmaker or those in a position to influence the decisionmaker.  Mulero-Rodríquez v. Ponte, Inc., 98 F.3d 670, 675-76 (1st Cir. 1996).  There is evidence that Mayberry, head of Puerto Rico operations for the parent company, was the key decisionmaker in the termination of Santiago-Ramos' employment.  It is also clear that Rivera, Santiago-Ramos' direct supervisor and general manager in Puerto Rico, was in a position to influence Mayberry in that decision.  Mayberry was located at the parent company and Rivera was based in Puerto Rico.  The two held "almost daily conference calls" during the crucial start-up phase when Santiago-Ramos worked at Centennial.  Rivera testified that Mayberry called him for his opinion regarding Santiago-Ramos' dismissal.  Bucks also testified that Rivera was involved in the decision.  This evidence is sufficient to support an inference that Rivera was in a position to influence Mayberry, the key decisionmaker.

The record reveals a number of comments made by both Mayberry and Rivera suggesting their concern about Santiago-Ramos possibly having a second child while working at Centennial, as well as concern about women with children working at Centennial in general.  For purposes of summary judgment, we cannot weigh the

-14-

credibility of witnesses making these comments and must assume they were made as stated. DeNovellis, 124 F.3d at 308, quoting Anderson, 477 U.S. at 249. The magistrate judge reviewed Mayberry's and Rivera's comments and held that they were "stray remarks," insufficient to enable a jury to conclude that Centennial's reasons for dismissing Santiago-Ramos were pretextual. We do not read the record the same way.

For example, two weeks prior to Santiago-Ramos' termination, she traveled to the parent company for training. At that time, Mayberry had no intention of firing her, despite knowing of her work problems. At a dinner held during the training, Mayberry specifically asked Santiago-Ramos about her ability to balance her current work and parental responsibilities. In response to Santiago-Ramos' response that she was balancing her duties well and that she would have another child, Mayberry questioned Santiago-Ramos' ability to fulfill her work responsibilities should she have a second child. The subject matter of Mayberry's comments (Santiago-Ramos' ability to work as a mother) coupled with Mayberry's previous impression of Santiago-Ramos (he was not inclined to fire her), together with the timing of Santiago-Ramos' dismissal (just two weeks after Mayberry made the comments), provides circumstantial evidence about the pretextual nature of Centennial's proffered nondiscriminatory reasons for Santiago-Ramos' dismissal. Such comments, made by Mayberry (the key decisionmaker), together with similar comments from Rivera (one in a position to influence the decisionmaker),

-15-

could lead a jury to conclude that Centennial's proffered reasons for firing Santiago-Ramos were actually a pretext for discrimination.

Santiago-Ramos also points to comments made by others at Centennial and the parent company that illustrate a discriminatory attitude in the company as a whole. Typically, statements made by "one who neither makes nor influences [a] challenged personnel decision are not probative in an employment discrimination case." Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 10 (1st Cir. 1990). However, evidence of a company's general atmosphere of discrimination "may be considered along with any other evidence bearing on motive in deciding whether a Title VII plaintiff has met her burden of showing that the defendants' reasons are pretexts." Sweeney v. Board of Trustees of Keene State College, 604 F.2d 106, 113 (1st Cir. 1979) (emphasis added). As recounted earlier, a number of other persons at Centennial and the parent company made comments to Santiago-Ramos and others concerning the company's treatment of female employees with children. While these comments are not proof of discrimination against Santiago-Ramos, they "add 'color' to the decision-making process at [Centennial] and to the reasons given for [her dismissal]." Id. A jury could reasonably rely upon these comments, together with other evidence such as comments by the decisionmakers, in concluding that Centennial's explanations are pretextual.

Another method of establishing pretext is to show that Centennial's nondiscriminatory reasons were after-the-fact

-16-

justifications, provided subsequent to the beginning of legal action. See Mariani Giron v. Acevedo Ruiz, 834 F.2d 238, 239 (1st Cir. 1987) (section 1983 case); Lex K. Larson, 1 Employment Discrimination § 8.04 at 8-76 (2d ed. 2000). A jury could interpret from the timing of such comments that Centennial's reasons are pretextual. On September 27, 1996, the date of Santiago-Ramos' dismissal, Rivera did not tell her why her employment was being terminated. A memorandum dated that same day identifies several reasons for the decision. However, Mejías, who typed that memorandum from Rivera's dictation, stated that it was prepared several weeks subsequent to the termination, after it was clear that Santiago-Ramos was initiating legal action against Centennial. A jury could rely upon Mejías' statement to conclude that Centennial's stated reasons for firing Santiago-Ramos were merely pretextual post hoc justifications because they were only provided in anticipation of litigation.

Santiago-Ramos can also establish pretext by showing "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons" such that a factfinder could "infer that the employer did not act for the asserted non-discriminatory reasons." Hodgens, 144 F.3d at 168 (internal quotations and citations omitted). A factfinder could do so here. First, as the magistrate judge held, the evidence regarding the demurrage charges Centennial incurred because of the tardy receipt of the communications towers suggests that this reason could be considered pretextual. There is evidence that

-17-

Santiago-Ramos was never assigned responsibility to pick up the towers, that she was unaware that the towers had arrived in Puerto Rico before she was dismissed, and that no one had reprimanded her about the towers incident during her tenure with Centennial. Second, Centennial cites the missing telephone incident as an important reason for firing Santiago-Ramos, stating that the telephones were crucial to its start-up operations. However, at the time the incident occurred, Rivera told Santiago-Ramos that it was "a minor matter." That the incident was minor to Rivera is supported by his assertion that he had no intention to fire her before being told to do so. Third, Centennial now stresses Santiago-Ramos' failure to complete the employee manual as a reason for her dismissal, although that problem did not appear in Rivera's memorandum regarding Santiago-Ramos' dismissal. The record reveals that Santiago-Ramos had ultimate oversight responsibility for the completion of the manual and that before Santiago-Ramos' dismissal Mayberry expressed concern that it was not completed. However, there is also evidence, from both Santiago-Ramos and Lourdes Lucas, the parent company's legal counsel, that Centennial's outside legal counsel was asked to provide a first draft of the manual and that revisions would have to be made to that draft. Santiago-Ramos testified that outside counsel was tardy in providing the first draft and that the revision process was underway when she was fired. Based upon these weaknesses in the nondiscriminatory reasons Centennial provided, the jury could find that the reasons were pretextual.

Having discussed whether Centennial's nondiscriminatory reasons were pretextual, we now address whether the record contains sufficient evidence of discriminatory animus. Domínguez-Cruz, 202 F.3d at 431. There is sufficient evidence here. For instance, after Santiago-Ramos told Mayberry that she was planning on having a second child in the next several years, he specifically questioned whether she would be able to manage her work and family responsibilities; shortly thereafter, her employment was terminated.

Having reviewed the evidence in the light most favorable to Santiago-Ramos, Domínguez-Cruz, 202 F.3d at 433, we conclude that there is sufficient evidence from which a reasonable jury could find that Centennial's proffered nondiscriminatory reasons for her dismissal were pretextual and that the actual reason was discriminatory. Our view of the facts at this point is necessarily shaped by the summary judgment standard of review and is only "a description of the permissible inferences that could be drawn from the facts and that suffice to defeat summary judgment." Id. Indeed, after the full presentation of the evidence at trial, a factfinder might very well decide differently. But Santiago-Ramos has raised a genuine issue of material fact as to the actual reason for her dismissal, and this suffices to allow her to present her sex discrimination case at trial. We reverse the magistrate judge on this issue.

**IV**

The next issue is whether the magistrate judge erred in granting summary judgment to Centennial on Santiago-Ramos' retaliation claim.  Pursuant to Title VII:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a).  A prima facie case of retaliation is made by a showing that:  (1) the employee engaged in conduct that Title VII protects; (2) the employee suffered an adverse employment action; and (3) the adverse action is causally connected to the protected activity.  Hernández-Torres v. Intercontinental Trading, Inc., 158 F.3d 43, 47 (1st Cir. 1998).

Santiago-Ramos argues that she was fired because she opposed the job fair profile Rivera presented, which allegedly excluded older persons with commitments, pregnant women, and women with children.  There is evidence that Rivera proposed such a policy and that Santiago-Ramos opposed it.  However, there is also evidence that Santiago-Ramos never reported her concerns to Mayberry or anyone else at the parent company.

For a retaliation claim "to survive a motion for summary judgment, the plaintiff must point to evidence in the record that would permit a rational factfinder to conclude that the employment

-20-

action was retaliatory."  King v. Town of Hanover, 116 F.3d 965, 968 (1st Cir. 1997).  Even assuming that Santiago-Ramos established the first two elements of the retaliation prima facie case, the magistrate judge correctly granted summary judgment on this claim because Santiago-Ramos has not established the third element:  that her dismissal was causally related to her opposition to the job fair profile.  The only evidence concerning Santiago-Ramos' retaliation claim is that Rivera allegedly proposed a discriminatory policy, Santiago-Ramos stated her opposition of the policy to Rivera, and Santiago-Ramos was later fired.  The parties dispute whether Mayberry ever knew about Santiago-Ramos' opposition to the policy; however, this dispute is immaterial to resolution of the issue.  Assuming Mayberry did know about her opposition, Santiago-Ramos has pointed to no evidence, save the decisionmakers' knowledge of Santiago-Ramos' opposition to the policy, suggesting that her dismissal occurred in retaliation for her opposition.  "It is insufficient for [one] to simply recount that [one] complained and . . . was disciplined . . . ."  Id.  Because there is no evidence that Santiago-Ramos' dismissal occurred in retaliation for her opposition to Rivera's job fair profile, we affirm summary judgment for Centennial on Santiago-Ramos' retaliation claim.  See id.

## V

The last issue is whether the magistrate judge erred in denying Santiago-Ramos' motion for summary judgment on her Puerto Rico Law 80 claims.  Santiago-Ramos' motion argued that the

-21-

probationary contract she signed was void and, therefore, that she was entitled to payment for 4.5 vacation days that she accumulated before her employment was terminated. Centennial opposed Santiago-Ramos' motion, arguing that it was filed after the date the magistrate judge set for the filing of dispositive motions and, alternatively, that the probationary contract was valid. The magistrate judge denied Santiago-Ramos' motion.

We first turn to Centennial's argument that the magistrate judge should not have entertained Santiago-Ramos' tardy motion. We review case management decisions for abuse of discretion, giving district courts wide latitude. Rosario-Díaz v. González, 140 F.3d 312, 315 (1st Cir. 1998). A party adversely affected by a district court's case management decision thus "bears a formidable burden" in seeking reversal. United States v. One 1987 BMW 325, 985 F.2d 655, 657 (1st Cir. 1993).

In a pretrial conference, the magistrate judge set January 15, 1998, as the deadline for dispositive motions. Santiago-Ramos' motion for partial summary judgment, filed March 17, 1998, was obviously late. However, despite its tardiness, the magistrate judge chose to entertain the motion, suggesting that the issues contained therein were related to issues discussed in Santiago-Ramos' simultaneous and timely filed opposition to Centennial's motion for summary judgment. Based upon that fact, as well as the relatively straightforward issue presented in the motion, we hold that the magistrate judge did not abuse his discretion by entertaining the motion.

We thus examine the magistrate judge's summary judgment decision on the merits. Puerto Rico Law 80 provides the exclusive remedy under Puerto Rico law for an employee who is discharged without demonstrating just cause. 29 L.P.R.A. §§ 185a-185m. Pursuant to Law 80, dismissed at-will employees are entitled to certain benefits, including payment for vacation time accrued and not enjoyed due to work demands. Id. § 185a; Beauchamp v. Holsum Bakers of P.R., Inc., 16 P.R. Offic. Trans. 641, 116 D.P.R. 522 (1985). However, an employee who is terminated during a probationary contract period is not entitled to those benefits. 29 L.P.R.A. § 185h. A probationary contract must, among other things, be "made in writing, stating the date on which said probationary period commences and ends, which in no case shall exceed three (3) months." Id. The term "month" is defined as "a period of thirty (30) consecutive calendar days." Id. If the contract does not "comply with the above conditions," a court must "render it null and void." Id.

The probationary contract Santiago-Ramos signed stated it was a 90-calendar day contract, commencing July 1, 1996, and ending September 30, 1996. However, the period from July 1 to September 30 is 92 days, not 90 days. Santiago-Ramos argues this error makes the probationary contract void, inasmuch as it violates the mandate in section 185h: a probationary contract never extends more than 90 days. Centennial argues that the error should be overlooked, inasmuch as the contract also states it was for 90 days. Alternatively, Centennial points out that the 90th day of

-23-

the probationary contract fell on a Saturday, and that continuing the deadline through until Monday, September 30, 1996, would be consistent with Federal Rule of Civil Procedure 6(a), which allows deadlines to be carried over past weekends and legal holidays. Finally, Centennial argues that the parties intended to enter a 90-day probationary contract, and pursuant to 31 L.P.R.A. § 3471, if the words of a contract "should appear contrary to the evident intention of the contracting parties, the intention shall prevail."

The parties have not cited, and our research has not uncovered, any Puerto Rico or federal case law interpreting the 90-day time limitation in section 185h. We must therefore do so ourselves. We interpret a Puerto Rico statute according to its plain meaning. A.M. Capen's Co. v. American Trading and Prod. Corp., 202 F.3d 469, 473 (1st Cir. 2000).

The statute plainly states that a probationary contract must specify "the date on which [it] commences and ends," and that the stated period "in no case shall exceed three (3) months," meaning three periods of "thirty (30) consecutive calendar days." 29 L.P.R.A. § 185h. Section 185h contemplates probationary contracts that are less than 90 days, but it is clear that no probationary contract may extend longer than 90 days. Section 185h is also straightforward that noncompliance with its requirements "shall render [the contract] null and void." Id. Santiago-Ramos' contract, while purporting to be a 90-day contract, clearly included a time period of 92 days, making it invalid. Centennial cites no authority for its argument that we can construe a contract

-24-

governed by Puerto Rico law with reference to the time deadline provisions of the Federal Rules of Civil Procedure.  Further, we cannot ignore the plain language of the statute in order to give meaning to the parties' contractual intent.

Because the contract states that it is a 90-day contract and also that it extends for 92 days, the party's actual intent is unclear.  Centennial points to no other documentary or testimonial evidence of the parties' actual intent in entering into this contract.  We are bound to apply the plain language of Puerto Rico statutory law, which is strict in mandating that a probationary contract that by its terms extends beyond 90 days be declared void.  We thus reverse the magistrate judge's denial of Santiago-Ramos' motion for partial summary judgment.

Santiago-Ramos is entitled to costs on appeal.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**