Santos **RIVERA MARTELL,** et al., Plaintiffs

v.

**AMERICAN EXPRESS CO.,** Defendants

v.

**ACE Insurance Co., Third–Party Defendants.**

**Civil No. 05–2131(JAG).**

United States District Court, D. Puerto Rico.

June 19, 2008.

Gerardo Gonzalez–Roman, Gerardo Gonzalez Roman Law Office, Ensanche Martinez, Mayaguez, PR, for Plaintiff.

Jose R. Garcia–Perez, A.J. Bennazar–Zequeira Bufete Bennazar, CSP, Hato Rey, PR, Francisco J. Colon–Pagan, Colon & Colon PSC, San Juan, PR, for Defendant.

## OPINION AND ORDER

GARCIA–GREGORY, District Judge.

Pending before the Court is Defendants' American Express Travel Related Services Company, Inc. ("Amex"), and ACE Insurance Company of Puerto Rico ("Ace") Motions for Summary Judgment. (Docket No. 53, 56). For the reasons set forth below, the Court **DENIES** Defendant Amex's and Ace's Motions for Summary Judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

On October 24, 2005, Santos Rivera Martell, Natividad Rivera and the conjugal partnership Rivera–Rivera (hereinafter, "Plaintiffs") filed a complaint against Amex. Plaintiffs allege that Amex violated the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.* ("FCRA"); and Article 1802 of the Puerto Rico Civil Code, P.R. Laws Ann. tit 31, § 5141 (2006) ("Article 1802").

Plaintiff, Santos Rivera Martell ("Rivera Martell") applied for several personal installment loans with Banco Popular of Puerto Rico and Citibank. On December 12, 2004, Rivera Martell was denied a personal loan application with Banco Popular. On January 6, 2005, Rivera Martell was also denied a loan application with Citibank. Rivera Martell then requested a credit bureau report from Equifax Credit Information Services, Inc. This report revealed that Amex notified the credit bu-

reau with information regarding an alleged delinquent account in Rivera Martell's name. Rivera Martell denies ever having an Amex credit card. Rivera Martell states that all bank denial decisions were based on information obtained from the credit bureau, which indicated that Plaintiffs had delinquent credit obligations.

Amex alleges that on August 6, 2001, Rivera Martell applied for a American Express Credit Card by telephone. Further, Amex contends that in the process of applying for said credit card, Rivera Martell corroborated his personal information, which was obtained by Amex through a consumer credit information agency. Rivera Martell denies that he corroborated his personal information with the intention of opening an account with Amex. Further, Rivera Martell avers that he never requested a credit card, nor entered into a contract with Amex. Amex claims that it sent Rivera Martell the requested credit card along with the cardmember agreement. Rivera Martell denies receiving the credit card and agreement.

Amex goes on to state that starting on September 12, 2001, monthly statements began to be sent to Rivera Martell at his address [1]. Rivera Martell accepts that he started receiving some letters from Amex, but he claims that he discarded them because he thought they were promotional letters and was not interested.

On April 11, 2002, an Ace agent contacted Rivera Martell by telephone to sell him a health insurance policy. During this call, a Mr. Juan Seguinoldi, identified himself as a "verification representative," but did not state who he worked for. Mr. Seguinoldi asked Rivera Martell whether he could give him permission to record his personal information for Rivera Martell's protection and confirmation. After Mr.

Seguinoldi verified Rivera Martell's name, address, date of birth, and telephone number, he proceeded to ask Rivera Martell for his social security number. At this point, Mr. Seguinoldi told Rivera Martell: "Do you understand that this plan will come into effect May 1st, 2002, and that your American Express card will be charged with the monthly premium of $135. You will have 30 days to evaluate the policy. If for this reason, it does not fulfill your expectations, you may call us at . . . ," to which Rivera Martell replied in the affirmative. Mr. Seguinoldi then proceeded to remind Rivera Martell that: ". . . your insurance company is Ace Insurance and I would like to confirm your enrollment in our Critical Illness program. Do you agree?" Rivera Martell answered by stating: "Well, um . . . What do you mean by enrollment? Tell me, explain it to me." Mr. Seguinoldi then responded: "Yes, if you give us permission to send you the policy by mail, so you have thirty days to evaluate it." To which Rivera Martell answered: "That is correct. Well, yes . . . so I can evaluate it, read it, and to see what it's about." Ace contends that through this conversation Rivera Martell accepted the policy and was therefore bound to the charges made to his credit card. Ace claims that as a result of this telephone call, it issued a policy named "Critical Illness Cash Plan" in Rivera Martell's name. However, Rivera Martell claims that he never accepted the policy because he believed he had thirty days to evaluate it before he had to accept.

Amex states that the first charge made to Plaintiffs' credit card appears in the monthly statement of the account dated May 12, 2002. Such charge appears as a payment to Ace made on April 24, 2002, in

---

**1.** From September 2001 to April 2002, all the monthly 1 statements indicated a balance of zero dollars.

the amount of $135. Rivera Martell denies ever receiving an Amex statement dated May 12, 2002, with a charge of $135. Amex avers that from May 1, 2002 onwards it paid Ace the monthly premium payments due under the Policy issued to Plaintiff until April 2004 [2]. Further, Amex contends that every monthly statement following the May 12, 2002 statement included a new charge for $135, plus late payment fees and interest. Amex contends that the unpaid charges to the credit card added up to $1004.84, and are all related to an Ace Insurance Policy. Rivera Martell disputes this; stating that no such debt exists and therefore he is under no obligation to pay it. Amex also states that the amount of premium payments that Ace received from Amex between May 1, 2002 and May 1, 2004, totaled $3,240 [3].

In their complaint, Plaintiffs allege that Amex violated the FCRA by reporting false information to Equifax Credit Information Services, Inc. ("Equifax"), regarding a debt on a American Express credit card that they never owned. Further, they contend that as a result of Amex's actions, their credit was negatively affected, which resulted in the denial of several personal loan applications. (Docket No. 1).

On June 21, 2006, Plaintiffs filed an Amended Complaint to include the fact that it had complied with the FCRA pre-requisites.[4] (Docket No. 13). On June 26, 2006, Amex answered the Amended Complaint, including a Counterclaim against Plaintiffs. The Counterclaim states that Plaintiffs owe Amex $824.47 for charges made to Rivera Martell's alleged credit card. (Docket No. 14).

On June 27, 2006, Amex filed a Third Party Complaint against Ace. The Third Party Complaint argues that Ace (Third Party Defendant) should indemnify Amex (Third Party Plaintiff) because the only charges made to Rivera Martell's alleged credit card were for an insurance policy issued by Ace. (Docket No. 16).

On July 24, 2006, Plaintiffs replied to the Counterclaim by stating that they are not liable for the money owed as they never opened an account with Amex, and therefore any charges made on that account were not made by them. (Docket No. 21).

On September 5, 2006, Ace answered to the Third Party Complaint. In its answer, Ace argues that on the April 11, 2002 telephone call, Rivera Martell agreed to the insurance policy and consequently, to its monthly premium payments due under the policy. Therefore, Ace argues that it should not be held liable for any damages attributable to Amex. (Docket No. 29). On December 11, 2006, Ace filed an Amended Answer the Third Party Complaint to include the argument that Ace cannot be

---

**2.** On or about April 23, 2004, Ace was notified by Amex that Rivera Martell's account had been cancelled. On April 23, 2004, the Ace Insurance Policy under Rivera Martell's name was terminated effective May 1, 2004.

**3.** This amount appears to be inconsistent with the Amex unpaid charges of $1,004.84.

**4.** Prior to this, on February 28, 2006, Amex filed a Motion to Dismiss claiming that Plaintiffs' complaint failed to state a cause of action. Further, the Motion to Dismiss also claimed that Plaintiffs could not seek relief because they failed to comply with the FCRA.

Amex alleged that Plaintiffs did not comply with the prerequisite that the credit card company receive notice of a dispute. Such notice must be from a consumer reporting agency, not just the consumer. (Docket No. 5). On April 5, 2006 Plaintiffs opposed such motion and presented a letter from Equifax, a consumer reporting agency, which stated that Amex had indeed been notified of a dispute. (Docket No. 11). This Court denied the Motion to Dismiss on the grounds that Plaintiffs had indeed complied with the requirements of the FCRA with regards to the notification to Defendant of a dispute. (Docket No. 12).

held liable for damages claimed in this case because they complied with its contractual obligations with Amex. (Docket No. 44).

On October 11, 2007, Amex filed a Motion for Summary Judgment alleging that there are no genuine issues of material fact in this case and therefore judgment should be in its favor. (Docket No. 53). On October 19, 2007, Ace filed a Motion for Summary Judgment seeking to dismiss the complaint or in the alternative to dismiss the Third Party Complaint. (Docket No. 56). Plaintiffs responded on November 30, 2006 to both Motions for Summary Judgment denying all of Amex's and Ace's undisputed facts. Ultimately, Plaintiffs argue that there are issues of material fact and therefore, this case needs to go to trial. (Docket No. 66, 67).

On December 10, 2007, Amex submitted a reply to Plaintiffs' opposition to its Motion for Summary Judgment. Amex claims that Plaintiffs did not provide enough evidence to dispute the facts presented in order to defeat their Motion for Summary Judgment. (Docket No. 69). On December 12, 2007, Ace presented a reply to Plaintiffs' response to their Motion for Summary Judgment. In it, Ace contends that summary judgment should be granted in its favor because the FCRA does not apply in this case since Plaintiffs have failed to proffer enough evidence to prove their case. In the alternative, Ace claims that it is not liable under the FCRA because it did not furnish any information to the credit bureau, and therefore falls outside the scope of the FCRA. Finally, on January, 9, 2008, Plaintiffs filed a sur-reply, in order to restate their arguments, as well as to include a copy Amex's profile from the Better Business Bureau of New York. This profile states, among other things, the number of complaints that Amex has had in the last twelve (12) months, broken down by issue, as well as the number of those that have been resolved. (Docket No. 76).

## DISCUSSION

### A. Standard of Review

The Court's discretion to grant summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure. Rule 56 states, in its pertinent part, that the Court may grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). *Santiago–Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 52 (1st Cir.2000). The party moving for summary judgment bears the burden of showing the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

■■■ Once a properly supported motion has been presented before the Court, the opposing party has the burden of demonstrating that a trial-worthy issue exists that would warrant the Court's denial of the motion for summary judgment. *Suarez v. Pueblo International, Inc.*, 229 F.3d 49, 53 (1st Cir.2000). For issues where the opposing party bears the ultimate burden of proof, the party cannot merely rely on the absence of competent evidence, but must affirmatively point to specific facts that demonstrate the existence of an authentic dispute. *Id.*

■■■ In order for a factual controversy to prevent summary judgment, the contested facts must be "material" and the dispute must be "genuine." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Material" means that a contested fact has the potential to change the outcome of the suit under governing law. The issue is

"genuine" when a reasonable jury could return a verdict for the nonmoving party based on the evidence. *Id.* It is well settled that "[t]he mere existence of a scintilla of evidence is insufficient to defeat a properly supported motion for summary judgment." *Id.* at 251, 106 S.Ct. 2505. It is therefore necessary that "a party opposing summary judgment must 'present definite, competent evidence to rebut the motion.'" *Maldonado–Denis v. Castillo–Rodriguez,* 23 F.3d 576, 581 (1st Cir.1994) (quoting *Mesnick v. General Elec. Co.,* 950 F.2d 816, 822 (1st Cir.1991), cert. denied, 504 U.S. 985, 112 S.Ct. 2965, 119 L.Ed.2d 586 (1992)).

■ In making this assessment, the Court "must view the entire record in the light most hospitable to the party opposing summary judgement, indulging in all reasonable inferences in that party's favor." *Griggs–Ryan v. Smith,* 904 F.2d 112, 115 (1st Cir.1990). Nonetheless, the Court must never "weigh the evidence and determine the truth of the matter," *Lipsett v. University of P.R.,* 864 F.2d 881, 895 (1st Cir.1988) (*quoting Anderson,* 477 U.S. at 249, 106 S.Ct. 2505) and "[n]o credibility assessment may be resolved in favor of the party seeking summary judgment." *Woodman v. Haemonetics Corp.,* 51 F.3d 1087, 1091 (1st Cir.1995). The Court may

safely ignore "conclusory allegations, improbable inferences, and unsupported speculation." *Medina–Munoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 8 (1st Cir.1990). "If, after this canvassing of the material presented, the district court finds that some genuine factual issue remains in the case, whose resolution one way or another could affect its outcome, the court must deny the motion." *Lipsett,* 864 F.2d at 895.

### B. American Express' Motion for Summary Judgment

■ Congress enacted the Federal Credit Reporting Act (FCRA), 15 U.S.C. §§ 1681, *et seq.,* as an answer to a growing congressional concern "over abuses in the credit reporting industry." *Guimond v. Trans Union Credit Info. Co.,* 45 F.3d 1329, 1331 (9th Cir.1995). The main purpose of the FCRA is that of protecting "consumers from the transmission of inaccurate information about them." *Kates v. Crocker Nat. Bank,* 776 F.2d 1396 (9th Cir.1985).

■ In lawsuits brought under the FCRA there is an interplay between three main characters, namely, 1) consumer reporting agencies[5], 2) users of consumer reports, and 3) the furnishers of information to consumer reporting agencies[6].

**5.** A "consumer reporting agency" is "any person whom, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and who uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports. 15 U.S.C.A. § 1681a(f) (1968). The term consumer reporting agencies includes credit bureaus, investigative reporting companies, and other organizations whose business is the gathering and reporting of information about consumers for use by others in deciding whether to grant credit, underwrite insurance, or employ the subject of such reports." 15A AM.JUR. 2D *Collection and Credit Agencies* § 38 (2008).

**6.** A "furnisher of information" is not defined in the FCRA, however, case law defines it as "an entity 'which transmits information concerning a particular debt owed by a particular consumer to consumer reporting agencies such as Equifax, Experian, MCCA, and Trans Union.'" *Vazquez–Garcia,* 222 F.Supp.2d 150 (2002) (*citing DiMezza v. First USA Bank Inc.,* 103 F.Supp.2d 1296, 1299 (D.N.M. 2000)) (*quoting Carney v. Experian Information Solutions, Inc.,* 57 F.Supp.2d 496 (W.D.Tenn.1999)). Examples include credit card companies, auto finance companies and mortgage banking institutions, among others.

*Vazquez–Garcia v. Trans Union de Puerto Rico,* 222 F.Supp.2d 150 (D.P.R.2002). Cases brought under the FCRA prior to September 30, 1997, held that "liability was limited to consumer reporting agencies and users of consumer reports." *Vazquez–Garcia,* 222 F.Supp.2d 150, 154 (2002). This meant that all furnishers of information, who willfully or negligently reported incorrect credit information to a credit reporting agency, were relieved of liability under the FCRA. In 1996[7], the schematics of liability under the FCRA changed, when Congress passed the Consumer Credit Reporting Reform Act. *Id.* This Act provided "new tools to insure that furnishers of information to consumer reporting agencies cooperate in maximizing the goal of the [FCRA] that only accurate and complete information is included in credit reports." *Id.* (*quoting* Richard J. Rubin "Fair Credit Reporting Act Amendments Provide New Duties on Furnishers of Information," Corporate Law and Practice Course Handbook Series, Practicing Law Institute, Vol. 4, Issue 1, p. 203 (April 1999)).

In this case, Plaintiffs seek that the court find Amex liable as a furnisher of information. Amex concedes in its Motion to Dismiss that it is a furnisher of information in the context of the FCRA, but denies any liability. *See* Docket No. 5, p. 3. Therefore, this Court will consider Amex as a furnisher of information for the purposes of this case.

The duties imposed on furnishers of information under the FCRA are found on section 1681s–2. The first subsection deals with the duty of furnishers of information to provide accurate information to consumer reporting agencies. 15 U.S.C.A. § 1681s–2(a). The second subsection addresses the duties of furnishers of information when they are put on notice of a dispute related to the accuracy of a credit report made to a consumer reporting agency. 15 U.S.C.A. § 1681s–2(b). The notice must be received from the consumer questioning the accuracy of their credit report, as well as from the consumer reporting agency who prepared the report for such consumer.[8] *Id.*

■ Under subsection § 1681s–2(b), upon receiving notice of a dispute from a consumer reporting agency, the furnisher of information must:(A) conduct an investigation with respect to the disputed information;(B) review all relevant information provided by the consumer reporting agency pursuant to section 1681i(a)(2); (C) report the results of the investigation to the consumer reporting agency; and (D) if the investigation finds that the information is incomplete or inaccurate, report those results to all other consumer reporting agencies to which the person furnished the information and that compile and maintain files on consumers on a nationwide basis. 15 U.S.C.A. § 1681s–2 (b). In other words, after the furnisher of information is notified of a dispute the "FCRA then holds both the consumer reporting agency and the furnisher of information of credit responsible for investigating a disputed item and for reporting only accurate information, so as to protect a consumer's credit report." *Vazquez–Garcia,* 222 F.Supp.2d 150, 158 (2002).

---

7. These amendments to the FCRA, did not become effective until September 30, 1997. *See* Pub.L. 104–208, Div. A, Title II, §§ 2412(d), (e)(2), Sept. 30, 1996, 110 Stat. 3009–446.

8. The FCRA procedure for consumers who question their credit reports "requires that the consumer dispute the report directly to the reporting agency ... then the reporting agency notifies the furnisher of information about the dispute." *Vazquez–Garcia,* 222 F.Supp.2d 150, 154 (*citing* 15 U.S.C.A. § 1681i and 15 U.S.C.A. § 1681s–2 (b)).

■ Failure to complete any of the above mentioned duties gives the consumer a private cause of action against the furnisher of information for FCRA non-compliance. *See Vazquez–Garcia*, 222 F.Supp.2d 150, 155 (2002). Such liability, permits the consumer to seek "statutory and actual damages, as well as the prevailing consumer costs and attorney's fees." *Id.* (*citing* 15 U.S.C. § 1681*o* ).

■ In this case, Plaintiffs contend that Amex has violated the FCRA for failing to adhere to its duties as a furnisher of information. Plaintiffs claim that they never made a contract with Amex for a credit card. Consequently, they claim that Amex, as a furnisher of information, negligently reported incorrect credit information, giving Plaintiffs a cause of action. In order to support these assertions, Plaintiffs have put forth an unsworn affidavit. Further, Plaintiffs submitted a copy of the credit bureau report, which shows their credit status as delinquent, for a debt owed to Amex.

In support of their Motion for Summary Judgment, Amex presents a number of exhibits, including the transcript of a conversation between Rivera Martell and an Ace representative. Further, it presented what appears to be a typed template credit card application form dated August 8, 2001, with Rivera Martell's information on it. However, this form does not have Rivera Martell's handwriting or signature anywhere on it to demonstrate his assent to the contract. Amex also included copies of the fourteen (14) monthly statements it sent to Plaintiffs. Amex also provided a copy of the cardmember agreement it allegedly sent to Plaintiffs along with the alleged credit card. Further, this agreement is not specifically addressed to Plaintiff. Moreover, it does not contain Rivera Martell's signature or otherwise document Plaintiffs' consent to a credit account with Amex. Finally, Amex also presents a transcript of a portion of Rivera Martell's deposition. In his deposition transcript, Rivera Martell consistently denies having an Amex credit card or agreeing to a contract with Amex or Ace. Rivera Martell admits that he never made payments on the credit card because he had no knowledge of any debt.

Since the evidence presented by both parties fails to tip the scale in favor of any party, this Court need not venture into a full discussion of the validity of the claims under the FCRA. The Court finds that there is insufficient evidence to prove contract formation, inasmuch as Plaintiffs' consent has not been properly documented. Furthermore, it is important to note that Plaintiffs have consistently denied that they ever consented to the credit card contract with Amex. Ultimately, this is a genuine factual issue that remains and must be determined by a jury. Therefore, this Court **DENIES** Amex's Motion for Summary Judgment.

### C. Ace's Motion for Summary Judgment

In its Motion for Summary Judgment, Ace requests that this Court dismiss the complaint and/or dismiss the third party complaint. Since Plaintiffs did not include Ace in their complaint, Ace does not have the standing to seek dismissal the complaint.

Rule 56 requires the moving party to file and annex to the motion a "separate, short, and concise statement of the material facts as to which the moving party contends there is no genuine issue to be tried," properly supported by specific references to the record. Similarly, the rule requires the non-moving party to file a statement of contested material facts. All material facts set forth in the moving party's statement "will be deemed to be admitted unless controverted by the statement required to be served by the

opposing party." The First Circuit has consistently upheld the validity of Rule 56. *See, e.g., Morales v. Orssleff's EFTF,* 246 F.3d 32, 33 (1st Cir.2001); *Rivas v. Federación de Asociaciones Pecuarias,* 929 F.2d 814, 816 n. 2 (1st Cir.1991).

In this case, Third Party Plaintiff, Amex, did not oppose the summary judgment motion filed by Ace. As a result, Amex has failed to comply with the so-called "anti-ferret rule," as they have not presented a concise statement of material facts as to which there is a genuine issue to be tried. The Court is not required to "ferret through the record" lurking for facts that may favor the Third Party Plaintiff when those facts were not proffered under a counterdesignation of facts as required by Rule 56. *Morales,* 246 F.3d at 33. "When a party opposing a Motion for Summary Judgment fails to comply with the 'anti-ferret rule,' the statement of material facts filed by the party seeking summary judgment [shall be] deemed ... admitted." *Mendez Marrero v. Toledo,* 968 F.Supp. 27, 34 (D.P.R.1997); *Tavarez v. Champion Prods., Inc.,* 903 F.Supp. 268, 270 (D.P.R.1995).

Here, Plaintiffs took the risk "to sit idly by and allow the summary judgment proponent to configure the record." *Kelly v. United States,* 924 F.2d 355, 358 (1st Cir. 1991). Although this fact does not automatically warrant the granting of summary judgment, "it launches [their] case down the road towards an easy dismissal." *Mendez Marrero,* 968 F.Supp. 27, 34. Since all material facts in Ace's statement of uncontested material facts are deemed admitted, the Court need only examine whether, given the uncontested facts, Ace is entitled to judgment as a matter of law.

However, even after admitting Ace's uncontested facts, the Court does not find enough evidence to grant summary judgment in favor of Ace. The fact that Ace limited the majority of its efforts to seeking dismissal of the complaint, rather than the Third Party Complaint, constrained the amount of arguments that this Court could evaluate in deciding its Motion for Summary Judgment. If Ace had concentrated its efforts in defeating Amex's Third Party Complaint against it, the probability of a positive outcome for Ace would have been much higher.

As a result, there are still issues of material fact that remain unclear. Specifically, there is an issue of credibility related to the existence of a contract between Ace and Rivera Martell that must be evaluated by a jury.

Lastly, since Ace's liability is contingent upon Amex's, granting Ace's Motion for Summary Judgment, would be a premature determination at this stage of the proceedings. Therefore, this Court **DENIES** Ace's Motion for Summary Judgment.

### CONCLUSION

For the reasons stated above, Amex's Motion for Summary Judgment (Docket No. 53) is DENIED. Further, Ace's Motion for Summary Judgment (Docket No. 56) is also DENIED.

IT IS SO ORDERED.