USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 96-1618 No. 96-1663 LORI-ANN MOLLOY, Plaintiff, Appellee, v. WESLEY BLANCHARD, ETC., ET AL., Defendants, Appellants. ____________________ APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND [Hon. Raymond J. Pettine, U.S. District Judge] ___________________ ____________________ Before Cyr, Circuit Judge, _____________ Campbell, Senior Circuit Judge, ____________________ and Stahl, Circuit Judge. _____________ ____________________ Kathleen M. Powers, with whom Marc DeSisto and DeSisto Law __________________ ____________ ___________ Offices were on brief for appellants. _______ Ina P. Schiff for appellee. _____________ ____________________ June 10, 1997 ____________________ CAMPBELL, Senior Circuit Judge. The former Chief ____________________ of Police and the City of Warwick, Rhode Island, appeal from a judgment against them in the district court entered on the jury's verdict in favor of a Warwick police officer.1 Plaintiff had alleged, inter alia, that she was treated ___________ disparately because of her gender and that her constitutional right to procedural due process was violated when the Chief suspended her without holding a hearing as required by state law. We affirm. I. We state the facts in the light most favorable to the verdict. See Ferragamo v. Chubb Life Ins. Co. of Am., 94 ___ _________ __________________________ F.3d 26, 27 n.1 (1st Cir. 1996). Plaintiff, Lori Ann Molloy, a police officer for the City of Warwick, Rhode Island, was suspended by Chief of Police Wesley Blanchard, on June 3, 1994. The suspension resulted from her ostensible refusal to cooperate with the state police in their investigation of a triple homicide involving Robert Sabetta, a police officer from the Town of Foster, Rhode Island.  Before Molloy joined the Warwick police department in 1991, she and Sabetta were in the same class at the police academy. After the police academy, Molloy had little contact  ____________________ 1. Cf. Molloy v. Blanchard, 907 F. Supp. 46 (D.R.I. 1995) ___ ______ _________ (granting in part and denying in part the defendants' motion for summary judgment). -2- 2 with Sabetta until 1993. In February 1993, Molloy spent an evening socializing with Sabetta and Paula Duffy, another police academy classmate and a police officer in Cranston, Rhode Island. During that evening, Sabetta showed Molloy and Duffy his personal firearm, a semiautomatic with a laser sight. Molloy saw Sabetta again approximately two weeks later. Duffy, with Sabetta in the car, drove to Molloy's home to show Molloy her new Jeep. The three then went to a nearby restaurant for pizza and beer. During the meal, Sabetta complained about his suspension for improper use of force. He commented that perhaps he should have killed, or should kill, the people whose complaints had resulted in his suspension. On April 13, 1993, Sabetta shot and killed three teenage boys and injured a fourth. Among the victims were persons who had filed brutality complaints against him. The injured victim identified Sabetta as the shooter. Molloy learned about the murders and Sabetta's involvement during her midnight to 8:00 a.m. shift on April 14, 1993. Molloy told her sergeant about knowing Sabetta from having attended the police academy with him.  Later that morning, Duffy contacted Molloy, worried that Sabetta might come to Duffy's home. At Molloy's suggestion, Duffy arranged to spend the night at the house of -3- 3 her friend Suzanne Jardine, also a Cranston police officer. Molloy stopped by Jardine's home after her duty shift. When the Sabetta matter was broached, Duffy stated that talking about the shootings upset her too much and that she did not want to discuss them further. Molloy acceded to her request. During their investigation, the Rhode Island state police contacted Molloy in June 1993 to ask her some general questions about Sabetta. Molloy did not volunteer that Sabetta had said either he should have killed or should kill the people who had filed a brutality complaint against him, nor did she mention knowing that Sabetta owned a semiautomatic with a laser sight. The murder weapon had been Sabetta's service revolver, not a semiautomatic. After the Sabetta murder trial began the following summer, the state police received an anonymous letter claiming that a Warwick police dispatcher and a Cranston police officer possessed information relevant to Sabetta's prosecution. This led the state police to interview Molloy on June 2, 1994. At this interview Molloy revealed her two meetings with Sabetta, his comments about the people who had complained about his brutality, and his ownership of the laser sighted semiautomatic. Not satisfied with the information Molloy had supplied, the state police asked her to report to their barracks for a third interview the following morning. During -4- 4 this session, Molloy told the state police about her visit with Duffy after the triple homicide. The police pressed Molloy for additional information, but Molloy denied having any. The state police called Chief Blanchard, told him that Molloy was refusing to cooperate with them, and asked him to come down to their barracks to speak with her. The Chief prepared a letter of suspension and then drove to the state police barracks with Deputy Chief Stephen Castiglioni and Captain Thomas K. Wilson.  After he arrived at the state police barracks, the Chief met with several investigators who accused Molloy of conspiring with Duffy to withhold information about the murders. The Chief then met with Molloy and, without asking for her side of the story, advised her to cooperate with the state police investigation. When she insisted she had told the state police all she knew, the Chief handed her the letter of suspension and told her she was suspended with pay until the state police concluded their investigation into her alleged conspiracy with Duffy. The Chief also barred her from participating in training activities and from entering the police headquarters building. Molloy remained on suspension for nine and a half weeks. While suspended she received her salary, but she lost the opportunity to work extra shifts, to participate in -5- 5 training sessions, and to work on special details, all activities which would have provided additional pay. While suspended, Molloy suffered emotional distress and damage to her personal and professional reputations. On several occasions during her suspension, Molloy was required while testifying as a witness in connection with arrests she had made before her suspension to explain in open court why she had been suspended. On June 9, 1994, approximately a week after her suspension, Molloy, with the help of her attorney, requested a hearing concerning her suspension pursuant to the Rhode Island Law Enforcement Officers' Bill of Rights, R.I. Gen. Laws 42-28.6-13(C) ("the Officers' Bill of Rights").2 The  ____________________ 2. Although it has since been amended, see 1995 R.I. Pub. ___ Laws ch. 19, 1, at the time of Molloy's suspension, R.I. Gen. Laws 42-28.6-13(C) stated: Emergency suspension may be imposed by the chief or the highest ranking officer of the law enforcement agency, when it appears that such action is in the best interest of the public. Any emergency suspension of any law enforcement officer shall consist of the law enforcement officer being relieved of duty and he or she shall receive all ordinary pay and benefits as he or she would have if he or she were not suspended. Any law enforcement officer so suspended shall be entitled to a prompt hearing before a hearing committee upon his or her request. The time period for the hearing is not to exceed fourteen (14) days. If, after hearing, the hearing committee does suspend or dismiss the law enforcement officer, he or she shall not be entitled to his or her pay and benefits; however, if the enforcement officer is reinstated by a subsequent hearing, he or she shall be entitled to be reimbursed for all salary and benefits that have not been paid. -6- 6 Chief had met with the City Solicitor, William Smith, the day before. The Chief testified Smith had advised him that he did not need to specify any charges against Molloy or afford her a hearing so long as Molloy was receiving full pay and benefits.3 The Chief did not charge Molloy, nor was he willing to grant her the hearing required by the Officers' Bill of Rights. Molloy filed a mandamus action in the Rhode Island Superior Court under R.I. Gen. Laws 42-28.6-14(2).4 The Chief never answered Molloy's state court complaint. In August 1994, the Chief reinstated her, reserving the right to file disciplinary charges upon the completion of the state police investigation. Her reinstatement rendered her state court mandamus action moot. In September 1994, the Attorney General informed the Chief that no criminal charges would be filed against Molloy.  ____________________ 3. In contrast, Smith testified he told the Chief to put Molloy on "administrative leave status" and specifically advised him not to suspend Molloy under the emergency suspension provision of the Officers' Bill of Rights, R.I. Gen. Laws 42-28.6-13(C), because that provision did not apply to Molloy's case. 4. R.I. Gen. Laws 42-28.6-14(2) states: Any law enforcement officer who is denied any right afforded by this subtitle may apply, either individually or through his or her certified or recognized employee organization, to the superior court where he or she resides or is regularly employed for any order directing the law enforcement agency to show cause why the right should not be afforded. -7- 7 On September 30, 1994, Molloy filed an eight-count5 complaint against the City of Warwick, the Chief, Warwick's Board of Public Safety, and Mayor Lincoln Chafee. Under 42 U.S.C. 1983,6 Molloy alleged she had been deprived of her constitutional rights to equal protection, free speech, and substantive and procedural due process. Under Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e et seq., ________ Molloy claimed disparate treatment because of her gender and disparate impact because of policies having a disparate negative impact on her as a woman. Under state law, Molloy alleged discrimination and the negligent or intentional infliction of emotional distress. Before trial, the district court dismissed, on grounds of qualified immunity, Molloy's claims for substantive and procedural due process violations against Mayor Chafee and her claim for a substantive due process violation against the Chief. The trial then proceeded. At  ____________________ 5. The complaint actually states nine counts, though two are labeled "VIII." However, the first two counts are apparently identical. 6. 42 U.S.C. 1983 states, in relevant part: Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. -8- 8 the close of all the evidence, the court granted judgment as a matter of law for all the defendants on Molloy's disparate impact and First Amendment claims. The court also granted judgment as a matter of law for Molloy on her procedural due process claim, submitting her gender discrimination claim to the jury. The jury was also instructed to ascertain damages on both claims.7 The jury determined that Molloy had been discriminated against on the basis of her gender. It awarded her $23,000 in damages on the discrimination claim as well as for violation of procedural due process as earlier found by the court. The district court denied Defendants' post- verdict motions for judgment as a matter of law, for a new trial, and to alter judgment. Defendants appealed. II. We turn first to Defendants' contention that the district court committed error in granting judgment as a matter of law against Defendants and in Plaintiff's favor on the procedural due process claim. This is a close question. Given, however, our affirmance, infra, of the jury's verdict _____ for Plaintiff on her Title VII claim for gender discrimination, there is no practical need to address it; however resolved, the outcome would not affect the damages  ____________________ 7. The remaining claims appear to have been dropped and, in any event, are not at issue in this appeal. -9- 9 awarded to Plaintiff. The jury provided a single damages award for both claims, and so long as Plaintiff is found entitled to have prevailed on either of the two claims, the award stands, with no alteration in the amount of damages regardless of whether one or both claims are upheld. The same conduct underlay both: the Chief's suspension of Molloy while depriving her of the hearing called for by the Officers' Bill of Rights. Her damages consisted in each instance of her lost opportunity to earn extra income while suspended (for special details, overtime, etc.) and her emotional distress and loss of reputation caused by her suspension. The special verdict form handed to the jury by the court instructed the jury to award a single amount of damages even if it found (as the jury reported it did) liability and causation under both of Molloy's legal theories.8 We also note that the district court's final judgment, which we affirm, infra, does not mention the _____ underlying legal theories but only states a finding of liability and the amount of damages.  Because the jury's damages award would be the same under either or both liability theories, and because we find there was sufficient evidence to support the jury's finding  ____________________ 8. Although liability under Molloy's procedural due process claim had been directed by the court, the causation determination under that theory was left to the jury, as were damages. -10- 10 of gender discrimination, infra, we need make no _____ determination as to whether or not the court erred in granting judgment to Plaintiff as a matter of law on her constitutional claim of a violation of procedural due process.9 Cf. Gulf Oil Co. v. Bernard, 452 U.S. 89, 99 ___ _____________ _______ (1981) ("[P]rior to reaching any constitutional questions, federal courts must consider nonconstitutional grounds for decision.").  Our analysis has the effect of mooting the district court's holding as to the due process claim, leaving that ruling without legal effect. Cf. Cardinal Chem. Co. v. ___ ___________________ Morton Int'l, Inc., 508 U.S. 83, 93-95 (1993) (recognizing ___________________ that in patent infringement cases, a finding of non- infringement prevents a court from reaching an affirmative defense asserting the patent's invalidity because the validity issue becomes "immaterial to the disposition of the case," and that any determination of the patent's validity by the district court in such a case should be vacated) (citing Electrical Fittings Corp. v. Thomas & Betts Co., 307 U.S. 241 _________________________ __________________ (1939)).   ____________________ 9. For the same reasons, we also do not reach the City's claim that it is not liable for the Chief's actions under  1983. The City does not contest respondeat superior liability under Title VII. See Randle v. City of Aurora, 69 ___ ______ ______________ F.3d 441, 450 (10th Cir. 1995); Hamilton v. Rodgers, 791 F.2d ________ _______ 439, 444 (5th Cir. 1986); Scott v. City of Topeka Police & _____ _______________________ Fire Civil Serv. Comm'n, 739 F.Supp. 1434, 1438 (D. Kan. _______________________ 1990). -11- 11 III. We turn next to Defendants' assertion that there was insufficient evidence to support the jury's verdict in Plaintiff's favor on the sex discrimination claim. Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. 2000e-2(a)(1). In a Title VII disparate treatment case, if, as is often true, see Smith v. Stratus Computer, Inc., 40 F.3d 11, ___ _____ ______________________ 15 (1st Cir. 1994), cert. denied, 115 S. Ct. 1958 (1995), the ____________ plaintiff has no direct proof of deliberate discrimination, "the plaintiff must make out a prima facie case of discrimination, the employer must then come forward with some non-discriminatory justification, and the plaintiff finally is given the opportunity to convince the trier of fact that the justification was pretextual and that the real reason was discriminatory." Cuello-Suarez v. Puerto Rico Elec. Power _____________ ________________________ Auth., 988 F.2d 275, 278 (1st Cir. 1993).  _____ For the prima facie case, a disparate impact plaintiff must "identify and relate specific instances where persons situated similarly 'in all relevant aspects' were treated differently." Dartmouth Review v. Dartmouth College, ________________ _________________ -12- 12 889 F.2d 13, 19 (1st Cir. 1989) (quoting Smith v. Monsanto _____ ________ Chem. Co., 770 F.2d 719, 723 (8th Cir. 1985), cert. denied, _________ ____________ 475 U.S. 1050 (1986)). "The test is whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated." Id. "Exact correlation is neither likely nor ___ necessary, but the cases must be fair congeners. In other words, apples should be compared to apples." Id. ___ The defendants contend that Molloy failed to establish a prima facie case by establishing that "similarly situated" males received more lenient treatment in respect to suspension. We disagree. At trial, the Chief himself testified that in approximately a dozen discipline cases involving Warwick police officers who were male,10 the Chief had afforded the officers the rights created by the Officers' Bill of Rights, as he conspicuously would not do for Molloy, a woman. Moreover, in a number of these cases he kept officers on active duty after learning that they were suspected of highly questionable behavior.  Scott Hornoff, for example, was the primary suspect in the state police investigation of the 1989 murder of a woman named Victoria Cushman. Although the Chief knew as of  ____________________ 10. The Chief also briefly referred to a situation involving a woman officer, but she was not identified, and the details of her case remain unclear. -13- 13 October 1991 that Hornoff was the main suspect, he did not suspend him as he later did Molloy but instead kept him on active duty working at an administrative job. Hornoff was not suspended until he was eventually indicted for murder by a grand jury in December 1994. It was conceded, moreover, that Hornoff's rights under the Law Enforcement Officers' Bill of Rights were recognized. Joseph Duquette, a senior Warwick police officer at the time of the Cushman case, interfered with the state police investigation of Hornoff. In 1993, Duquette issued a memorandum in which he ordered the members of the Warwick Major Crimes Unit not to discuss the Cushman investigation with anyone from the state attorney general's office unless such a discussion took place pursuant to a subpoena or with the explicit permission of Duquette, then-Commander Castiglioni or Chief Blanchard. Duquette was not disciplined in any way for his interference with the state police investigation until August of 1995, after Chief Blanchard had been replaced by Chief DeFeo. While Appellants argue that the Chief was unaware of Duquette's activity, we find sufficient evidence in the record from which the jury could have properly inferred knowledge. We conclude that Molloy presented evidence sufficient for the jury to have found that she had -14- 14 established her prima facie case that "similarly situated" males had received dissimilar treatment. The defendants go on to argue that even if the conduct of the disciplined male officers was sufficiently similar in material respects to Molloy's to establish a prima facie case, the weight of the evidence was insufficient to support a finding "that the justification [offered by the defendants] was pretextual and that the real reason was discriminatory." Cuello-Suarez, 988 F.2d at 278. _____________ Presented with the evidence of cases such as Hornoff's and Duquette's in which male police officers who had committed similar or more severe offenses than those Molloy was accused of were either not disciplined or, if disciplined, were first afforded their rights under the Officers' Bill of Rights, the jury was entitled to infer that the Chief's proffered explanation for his more harsh treatment of Molloy the state police's advice that she was refusing to cooperate with them and the ostensible advice that the granting of rights was unnecessary where, although suspended, she was still being paid was a pretext.  Essentially the same evidence also allowed a reasonable jury to conclude that the plaintiff had carried her burden of proving that the Chief had discriminated against Molloy because of her gender in violation of Title VII. See Udo v. Tomes, 54 F.3d 9, 13 (1st Cir. 1995) ___ ___ _____ -15- 15 (holding that a plaintiff may rely on the same evidence to prove both pretext and discrimination). Molloy was suspended without being offered the same rights granted to similarly situated male officers. Moreover, the reasons supplied by the Chief for his refusal to provide Molloy with a hearing were so flimsy as to permit a finding of mendacity: The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will permit ______ the trier of fact to infer the ultimate fact of intentional discrimination . . . . St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511 (1993). ______________________ _____ See also Woods v. Friction Materials, Inc., 30 F.3d 255, 260- ________ _____ ________________________ 61 n.3 (1st Cir. 1994); LeBlanc v. Great Am. Ins. Co., 6 F.3d _______ __________________ 836, 843 (1st Cir. 1993), cert. denied, 511 U.S. 1018 (1994). ____________ The Chief was experienced in matters arising under the Officers' Bill of Rights, yet he refused to grant Plaintiff her rights even after, with the assistance of an attorney and a union representative, she had requested a hearing. The Chief said that he had refused to grant Molloy a hearing because the City Solicitor had told him no hearing was required. Yet the statutory language seems utterly clear that a hearing was required in this case. See R.I. Gen. Laws ___ ___ 42-28.6-13(C) ("Any law enforcement officer so suspended -16- 16 shall be entitled to a prompt hearing before a hearing committee upon his or her request."). The Chief's outright refusal was in marked contrast to his regular allowance of these rights to male officers. We hold that the jury had sufficient evidence from which to infer discriminatory intent.  IV. The defendants' remaining contentions are not persuasive. First, they argue that the district court made certain errors in admitting evidence at trial. Our review of the record satisfies us that such errors, if any, were harmless. See Lataille v. Ponte, 754 F.2d 33, 37 (1st Cir. ___ ________ _____ 1985) ("Our standard for determining whether the admission of such evidence is harmless error is whether we can say 'with fair assurance . . . that the judgment was not substantially swayed by the error . . . .'") (quoting United States v. _____________ Pisari, 636 F.2d 855, 859 (1st Cir. 1981) (quoting Kotteakos ______ _________ v. United States, 328 U.S. 750, 765 (1946))). _____________ Defendants protest that there was insufficient evidence to allow a reasonable jury to award $23,000 in damages, pointing out that Molloy could not have lost more than $5,000 in overtime, training, detail work and the like. They acknowledge that the jury may have granted all or some of the remaining damages to compensate for Molloy's emotional distress, but insist that since there were other potential -17- 17 causes of Molloy's distress, such as the state police interrogation and her worries about possible criminal prosecution, expert testimony was essential to establish what portion of her distress came from her suspension. They cite Andrade v. Jamestown Hous. Auth., 82 F.3d 1179, 1187-88 (1st _______ _____________________ Cir. 1996), as holding that where there is more than one possible cause of a plaintiff's emotional distress, expert testimony is required to establish that it was the defendant's conduct that caused the plaintiff's symptoms and not some other factor. The defendants misstate our holding in Andrade. In _______ that case, the plaintiff had a previous history of stomach problems, headaches, and diarrhea. We held that medical testimony was required for the plaintiff to prove that the irritated bowels, diarrhea, tension headaches and sleeplessness she experienced were the result of emotional distress caused by the defendant and not merely a continuation of her previous medical problems. In that case, we sought to avoid putting juries in the position of evaluating the effect of a preexisting medical condition without the aid of expert medical testimony. We stated, "[W]e are not establishing a bright-line rule that expert testimony is always necessary to prove the causation prong of [intentional infliction of emotional distress]. There may very well be situations where causation is within the common -18- 18 knowledge and experience of the layperson . . . ." Id. at ___ 1188 n.5. This is such a case. There is no contention that Molloy's asserted anxiety, nervousness, nausea and sleeplessness derived from a preexisting medical condition. The sole issue was the role of Defendants' conduct in producing those symptoms and the placing of a fair monetary valuation on them relative to the circumstances of this case. The jury heard and could evaluate her testimony describing what effect the suspension had upon her as compared with other events. It is unclear how an expert could have helped. This is the kind of determination typically entrusted to juries. Besides emotional distress, Molloy also testified that the defendants' actions caused her to suffer damage to her personal and professional reputations. She stated that her suspension, related as it was to Sabetta's murder trial, received substantial publicity. Also, during her suspension Molloy testified as a witness at several trials in connection with arrests she had made previously. At these trials, she had to admit in open court that she was then suspended and was obliged to describe the circumstances surrounding her suspension. The jury was entitled to compensate Molloy for these additional elements of damage. The judgment is affirmed. Costs to appellee. ________________________ _________________ -19- 19