**Deborah HARLOW, Plaintiff,**

v.

**John E. POTTER, Postmaster General, United States Postal Service, Defendant.**

**No. CV–03–146–B–W.**

United States District Court, D. Maine.

Jan. 27, 2005.

Arthur J. Greif, Gilbert & Greif, P.A., Julie D. Farr, Gilbert & Greif, P.A., Bangor, ME, for Deborah A Harlow, Plaintiff.

David R. Collins, Office of the U.S. Attorney, District of Maine, Portland, ME, for Postmaster General, Defendant.

## ORDER ON DEFENDANT POSTMASTER GENERAL'S MOTION FOR SUMMARY JUDGMENT

WOODCOCK, District Judge.

The Postmaster General, United States Postal Service ("Postal Service") fired Deborah Harlow for falsifying her work hours. After an Arbitrator, acting under the collective bargaining agreement, put her back to work with full back pay, she sued the Postal Service for sex discrimination. Because there is a genuine issue of material fact as to whether in terminating Ms. Harlow, the Postal Service acted as the "cat's paw" for the discriminatory animus of her supervisor, this Court DE-

NIES the Postal Service's Motion for Summary Judgment.

## I. STATEMENT OF FACTS

In accordance with "conventional summary judgment praxis," this Court recounts the facts in a light most favorable to Ms. Harlow's theory of the case consistent with record support.[1] *Gillen v. Fallon Ambulance Serv. Inc.,* 283 F.3d 11, 16 (1st Cir.2002). This Court has relied either on the uncontested facts or on Ms. Harlow's version, if contested.

In 2001, Ms. Harlow was a clerical craft employee who worked on various mail sorting machines in the automation section on Tour 1 (the night shift) at the Postal Service's Hampden facility. (Def.'s Statement of Undisputed Facts Including Material Facts ¶ 1 (Docket # 16)("DSMF")).[2] Christopher Parker was the supervisor of distribution operations of automation for Tour 1 at the Hampden facility, and Darrell Hafford was a first level supervisor for Tour 1 at the Hampden facility. (DSMF ¶¶ 3, 4).

Postal Service employees are issued electronic time cards, which are routinely swiped to record an employee's time entry and document the time worked. (DSMF ¶ 14). If an employee forgets her time card, she is required to complete a Postal Service Form 1260 to verify the hours actually worked. (DSMF ¶ 14, Pl.'s Resp. to Def.'s Statement of Undisputed Facts & Statement of Additional Facts ¶ 14 (Docket # 22)("PSMF")). On December 2, 2001, Ms. Harlow came to work without her time card and filled out a Form 1260 at the beginning of the Tour, leaving it on Mr. Hafford's desk as she "had so many times

---

1. Ms. Harlow filed a Motion to Strike. This Court dismisses the Motion to Strike; none of the objected to facts is necessary to resolve the Postal Service's Motion for Summary Judgment.

2. The information contained in the citations to "DSMF" has been admitted, in pertinent part, by Ms. Harlow.

before." (DSMF ¶ 42). On the Form 1260, she represented that she began her Tour at 10:00 p.m., checked out for lunch at 5:00 a.m. (December 3rd), returned to work at 5:30 a.m., and finished work at 6:30 a.m. (DSMF ¶ 42).

Ms. Harlow's time card was inaccurate. She testified that, on the night of December 2, 2001, she worked with Dean Harlow,[3] a co-employee, until about 4:10 a.m. the next day, when Mr. Harlow left. (DSMF ¶ 43). She then worked with automation clerk Mae Brown from about 4:40 a.m. to 5:05 a.m. (DSMF ¶ 43). Ms. Harlow worked with a casual employee until 5:45 a.m. and then took her break and lunch. (DSMF ¶ 43). Ms. Harlow testified she left the Hampden facility at 5:55 or 6:00 a.m. and drove to Shaw's Market. (DSMF ¶ 44). She said travel to Shaw's took "just a few minutes" and she spent approximately ten minutes in the store before returning to the Hampden facility around 6:20 a.m. (DSMF ¶ 44). She went to the break room and the bathroom, and then she left. (DSMF ¶ 44). Duncan Stewart, an employee who was also working the Tour 1 at the Hampden facility, believes he and Ms. Harlow left the facility at about the same time on the morning of December 3, 2001, because he passed Ms. Harlow in her vehicle on the interstate after he left work that morning. (PSMF ¶ 83).

On December 3, 2001, Mr. Parker was the acting Tour superintendent and man-ager of distributor operations ("MDO") because Shirley Burrill, the regular MDO, was not working. (DSMF ¶ 40). As acting MDO, Mr. Parker was responsible for the complete Tour operation. (DSMF ¶ 40). Mr. Hafford, the automation supervisor, had an appointment and left around 5:30 a.m. that day. (DSMF ¶ 41). Thereafter, Mr. Parker was required to supervise the automation section. (DSMF ¶ 41). Around 6:05 a.m., Mr. Parker paged Ms. Harlow because he had a question for her, and when she did not respond, he searched for her in the break rooms to no avail and could not locate her car in the parking lot. (DSMF ¶¶ 46–47, PSMF ¶ 46–47). He searched the parking lot again as he left the facility around 6:30 a.m., but did not see Ms. Harlow's car. (DSMF ¶ 48, PSMF ¶ 48). Mr. Parker filled out a Request for Notification of Absence, noting that Ms. Harlow was absent from her work station for twenty-five minutes, from 6:05 a.m. to 6:30 a.m. (DSMF ¶ 48). Her pay was docked for this time. (DSMF ¶ 48, n. 26). When Ms. Harlow returned to work on her next shift, the evening of December 3, 2001, Mr. Parker asked her where she was the night before. (DSMF ¶ 49). She told him she was at the grocery store and offered to change the Form 1260. (DSMF ¶ 49).

The next day, December 4, 2001, Mr. Parker discussed the matter with the acting plant manager, Robert Brydon.[4] (DSMF ¶¶ 6, 50). Mr. Brydon did not

---

3.  Dean Harlow, who was married to Ms. Harlow in October 2002, was also an automation clerk on Tour 1 at the Hampden facility. (DSMF ¶ 2).

4.  Although Mr. Parker had the authority on his own to determine appropriate discipline, he was inexperienced as a supervisor and felt he was in "fairly foreign territory." (DSMF ¶ 52). He did not know what to do and assumed Ms. Harlow would be issued a letter of warning:

[P]ersonally, I didn't think the case would go to a letter of removal. I didn't have any case knowledge of how to handle anything like this; and so I assumed worse case would be a letter of warning. And come to find out, when the word came back from labor relations, I was told, no, letter of removal.

(DSMF ¶ 52).

know Ms. Harlow personally. (DSMF ¶ 6). Mr. Parker told Mr. Brydon he had previously discussed with Ms. Harlow being out of the building when her time reports indicated she was working and using a Form 1260 in lieu of a time card. (DSMF ¶ 50). Mr. Parker did not tell Mr. Brydon that Ms. Harlow took her lunch break at a different time than shown on the Form 1260 or that she actually worked the number of hours the Form 1260 indicated. (PSMF ¶ 110). Mr. Brydon contacted Shirley Pointer, a labor specialist who worked in the Labor Relations Office in Portland, and relayed the information provided by Mr. Parker. (DSMF ¶¶ 7, 50, 51). Ms. Pointer did not know Ms. Harlow personally. (DSMF ¶ 51). Mr. Brydon discussed the matter with Ms. Pointer and expressed his concern that Ms. Harlow's actions constituted falsification, and Ms. Pointer agreed. (DSMF ¶ 53). Relying on information provided by Mr. Brydon, Ms. Pointer recommended removal. (DSMF ¶ 53, PSMF ¶ 115). Neither Mr. Brydon nor Ms. Pointer spoke with Ms. Harlow or conducted an independent investigation before her termination. (PSMF ¶ 114).

Ms. Harlow was issued a Notice of Removal on December 27, 2001, effective December 28, 2001. (DSMF ¶ 62). However, because the Postal Service is required to give an employee thirty days of administrative leave before termination, Ms. Burrill, the MDO for Tour 1, sent Ms. Harlow a letter the next day advising her that her separation day would be January 27, 2002. (DSMF ¶¶ 5, 62).

Through her union, Ms. Harlow filed a grievance protesting the Notice of Removal. (DSMF ¶ 63). After Mr. Parker and Ms. Harlow were unable to resolve her grievance at Step 1 of the process, on January 9, 2002, Gary Walcutt, the president of the local postal workers union, filed an appeal and requested that Ms. Burrill meet with him about the grievance. (DSMF ¶ 63). Under the grievance procedure, Ms. Burrill was required to make a decision based on the information provided to her; she did not think it was her role to conduct further investigation, particularly because the union did not want to further investigate the matter. (PSMF ¶ 117, Def.'s Reply to Pl.'s Additional Facts ¶ 117 (Docket # 30)). At the conclusion of Step 2 of the grievance proceeding, Ms. Burrill denied Ms. Harlow's grievance because she concluded falsification was a terminable offense. (DSMF ¶ 66). Although discipline is usually progressive; that is, discipline generally begins with an official discussion, then a letter of warning, then suspension, and finally termination, Ms. Burrill stated the nature of the infraction must be considered when determining discipline. (DSMF ¶ 59). She concurred in the decision to terminate Ms. Harlow. (DSMF ¶ 55).

In June 2002, an arbitration hearing was held under the collective bargaining agreement.[5] (DSMF ¶ 69, Ex. 12). The Arbitrator determined that Ms. Harlow's removal was not for just cause and ordered her reinstated with full back pay and no loss of seniority. (DSMF ¶ 72, Ex. 12). Ms. Harlow returned to work on September 1, 2002, and at some point Mr. Parker was reassigned to Tour 1, where Ms. Harlow worked. (DSMF ¶ 72). She stated that, although Mr. Parker did not harass her, being around him made her "uncomfortable." (DSMF ¶ 72). She also said that "it will never be the same" with Mr. Hafford and that another supervisor, Wally Smyth, who was previously "very friendly," did not talk to her. (DSMF ¶ 72, n.

---

5. Ms. Harlow also filed an EEO Complaint on February 10, 2002, alleging that Mr. Parker and Mr. Hafford discriminated against her on the basis of sex. (DSMF ¶ 70, Ex. 33).

39). Ms. Harlow bid a shift change, and since October 2003 has worked in a similar position on Tour 3. (DSMF ¶ 73). Ms. Harlow continues to work for the Postal Service today.

Ms. Harlow filed this Complaint, alleging she is entitled to compensatory damages because she "has been injured in body and spirit as a result of the unlawful and intentional discrimination" and punitive damages because the Postal Service acted "with malice or with reckless indifference to [her] rights in discriminating against and terminating her." (Compl. ¶¶ 6–7 (Docket # 1)). She is also seeking an order requiring the Postal Service to cease and desist from unlawful practices and an order awarding her back pay, attorney fees, costs, interest, and such other relief as may be just and equitable. (Compl.¶ 10).

## II. DISCUSSION

### A. Standard of Review

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

Fed.R.Civ.P. 56(c). A fact is "material" if it has the "potential to affect the outcome of the suit under the applicable law," *Santiago–Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 52 (1st Cir.2000), and for an issue to be "genuine," the evidence relevant to the issue, viewed in the light most favorable to the non-moving party, must be "sufficiently open-ended to permit a rational factfinder to resolve the issue in favor of either side," *Nat'l Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 735 (1st Cir.1995), *cert. denied*, 515 U.S. 1103, 115 S.Ct. 2247, 132 L.Ed.2d 255 (1995).

The trial court is obligated to view the entire record in the light most hospitable to the nonmovant and indulge "all reasonable inferences in that party's favor." *Cadle Co. v. Hayes*, 116 F.3d 957, 959 (1st Cir.1997); *Griggs–Ryan v. Smith*, 904 F.2d 112, 115 (1st Cir.1990). This Court has stated, however, that in discrimination actions, "[c]aution is appropriate when considering summary judgment for an employer." *Bilodeau v. Mega Indus.*, 50 F.Supp.2d 27, 46 (D.Me.1999).

### B. Sex Discrimination [6]

Title VII of the Civil Rights Act of 1964 prohibits employers from discriminating against an individual with respect to her

**6.** The Postal Service makes a rather cursory and ambiguous exhaustion argument in its opening brief. It argues that, because only one issue was accepted for investigation and approved by Ms. Harlow—whether she suffered from discrimination when she was issued a Notice of Removal charging her with falsification of a Form 1260—any other claims have not been exhausted administratively, (Def.'s Mot. for Summ. J. & Incorporated Mem. of Law at 5–6 (Docket # 17)). The Postal Service does not appear to be arguing that Ms. Harlow failed to file an administrative complaint in a timely manner.

In response to the Postal Service's exhaustion argument, this Court concludes that Ms.

Harlow's Complaint sets forth claims within the scope of the administrative complaint and EEOC investigation:
> An administrative charge is not a blueprint for the litigation to follow..... Thus, the exact wording of the charge of discrimination need not presage with literary exactitude the judicial pleadings which may follow..... Rather, the critical question is whether the claims set forth in the civil complaint come within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination.

*Powers v. Grinnell Corp.*, 915 F.2d 34, 38–39 (1st Cir.1990) (citations omitted).

employment on the basis of her sex.[7] 42 U.S.C. § 2000e–2(a)(1). A Title VII sex discrimination claim may be proven with direct evidence of discrimination, such as "an admission by the employer that it explicitly took [sex] into account in reaching an employment decision." *Smith v. F.W. Morse & Co.*, 76 F.3d 413, 421 (1st Cir. 1996). Such "smoking gun" evidence is rare, but sex discrimination may also be proven with circumstantial evidence. *Id.*

When considering circumstantial evidence of sex discrimination, courts apply a three-stage, burden-shifting framework first articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and further delineated in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), and *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). Pursuant to the *McDonnell Douglas* three-stage, burden-shifting framework, a plaintiff "must make out a prima facie case of discrimination, the employer must then come forward with some non-discriminatory justification, and the plaintiff finally is given the opportunity to convince the trier of fact that the justification was pretextual and that the real reason was discriminatory." *Molloy v. Blanchard*, 115 F.3d 86, 91 (1st Cir.1997)(quoting *Cuello–Suarez v. Puerto Rico Elec. Power Auth.*, 988 F.2d 275, 278 (1st Cir.1993)).

### 1. Prima Facie Case

■ An employee alleging sex discrimination must first establish a prima facie

case by showing: (1) she belonged to a protected class; (2) she performed her job satisfactorily; (3) her employer took an adverse employment decision against her; and, (4) her employer continued to have her duties performed by a comparably qualified person. *Santiago–Ramos*, 217 F.3d at 54. At the prima facie stage in a disparate treatment case, a plaintiff is not required to demonstrate she was treated differently than similarly situated employees who were not in the protected class. *Kosereis v. Rhode Island*, 331 F.3d 207, 213 (1st Cir.2003); *Conward v. Cambridge Sch. Comm.*, 171 F.3d 12, 19 (1st Cir.1999). The prima facie case is a "small showing" that is "not onerous" and "easily made." *Kosereis*, 331 F.3d at 213 (citations omitted).

Three elements of Ms. Harlow's prima facie case are clearly met: she is a woman; she was fired; and comparably qualified persons continued to perform her work responsibilities.[8] Whether Ms. Harlow performed her job satisfactorily at the Postal Service is not as clear; however, this Court need not reach this issue because of the second-stage inquiry. *See Santiago–Ramos*, 217 F.3d at 54.

### 2. Non–Discriminatory Justification

Applying the *McDonnell Douglas* burden shifting analysis, the burden of production shifts to the Postal Service to provide a "legitimate, nondiscriminatory reason for its decision." *Kosereis*, 331

---

7. The Equal Employment Opportunity Act of 1972 extended Title VII's protections to certain federal employees, including United States Postal Service employees. *See* 42 U.S.C. § 2000e–16(a). § 2000e–16(a) provides, in part, that all personnel actions affecting covered employees "shall be made free from any discrimination based on race, color, religion, sex, or national origin." *Id.*

8. Neither party cites to any record reference indicating who filled Ms. Harlow's position between the time she was fired and the time she was reinstated. However, nowhere in the Postal Service's brief does it dispute that, during this interim period, Ms. Harlow's duties were performed by a comparably qualified person.

F.3d at 212; *see also Zapata–Matos v. Reckitt & Colman, Inc.*, 277 F.3d 40, 44 (1st Cir.2002). The employer's burden is merely a burden of production; the employee maintains the burden of proof throughout. *Hicks,* 509 U.S. at 507, 113 S.Ct. 2742. If the employer offers a non-discriminatory reason, the inference of discrimination fades away. *Che v. Massachusetts Bay Transp. Auth.*, 342 F.3d 31, 39 (1st Cir.2003). The Postal Service claims that Ms. Harlow was terminated because she falsified a Form 1260. Ms. Harlow concedes this reason is sufficient to drop the inference of discrimination. The analysis proceeds to the third stage.

### 3. Pretext

■ At the third stage, with the initial presumption of discrimination removed, the burden shifts to the employee to "present sufficient evidence to show both that the employer's articulated reason ... is a pretext and that the true reason is discriminatory." *Thomas v. Eastman Kodak Co.*, 183 F.3d 38, 56 (1st Cir.1999), *cert. denied,* 528 U.S. 1161, 120 S.Ct. 1174, 145 L.Ed.2d 1082 (2000) (citations omitted). "Plaintiffs may use the same evidence to support both conclusions, provided that the evidence is adequate to enable a rational factfinder reasonably to infer that unlawful discrimination was a determinative factor in the adverse employment action." *Id.* at 57 (citations omitted).

This Court must decide whether, "viewing the aggregate package of proof" offered by Ms. Harlow and taking all inferences in her favor, Ms. Harlow has raised a genuine issue of fact as to whether the termination was motivated by sex discrimination. *See Santiago–Ramos,* 217 F.3d at 54. If there is sufficient evidence in the record from which a jury could infer that the Postal Service's proffered reasons for firing Ms. Harlow were pretextual and

that it made its decision because of discriminatory animus, summary judgment for the Postal Service is inappropriate. *See id.*

■ This Court first addresses whether evidence of pretext exists, having in mind that courts should exercise particular caution before granting summary judgment for employers on such issues as pretext, motive, and intent. *See Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 167 (1st Cir.1998). Ms. Harlow presents no evidence that the final decision makers—Mr. Brydon and Ms. Pointer—had discriminatory intent. Nevertheless, she urges this Court to apply the "cat's paw" theory, under which the Postal Service is liable for discrimination if Mr. Parker's discriminatory motivation tainted the ultimate outcome. To invoke the cat's paw analysis, Ms. Harlow must submit evidence sufficient to establish two conditions: (1) that Mr. Parker exhibited discriminatory animus; and, (2) and the final decision-makers—Mr. Brydon and Ms. Pointer—acted as the conduit of Mr. Parker's prejudice. *See Russell v. McKinney Hosp. Venture,* 235 F.3d 219, 227 (5th Cir.2000); *Long v. Eastfield Coll.*, 88 F.3d 300, 307 (5th Cir.1996).

### a. Mr. Parker's Discriminatory Animus

Viewing the evidence in the light most favorable to Ms. Harlow, there is evidence upon which a reasonable jury could find Mr. Parker harbored discriminatory animus toward Ms. Harlow on account of sex. First, there is evidence Mr. Parker treated Ms. Harlow and other female employees more harshly than male employees. Duncan Stewart, the union shop steward, avers that: 1) Mr. Parker has given preferential treatment to certain male employees, including failing to discipline two male employees who were downtown when they

were on the clock and supposed to be working; 2) it is not unusual for Postal Service employees to use a Form 1260 to indicate a lunch break different from the one they actually took, and no other Postal Service employee has been disciplined for doing so; 3) Mr. Parker has been the subject of complaints by female employees of abusive and intimidating behavior and there are no similar complaints by male employees; and, 4) in the fall of 2001, he reported a male employee for stealing postal equipment and no disciplinary action was taken against him. (PSMF ¶¶ 91–98).

There is other evidence supporting Mr. Stewart's contentions. Ms. Harlow testified that a male employee, David Ballard, previously filled out a Form 1260 for an entire month showing a fictitious lunch break, with no adverse consequences. (PSMF ¶ 100). Ms. Harlow contends another indication of Mr. Parker's discriminatory intent is when he reprimanded her for wearing a shirt he claimed was inappropriate even though she had worn that shirt to work many times without consequence. (PSMF ¶ 125). There is further evidence that Mr. Parker, along with Mr. Hafford, scheduled Ms. Harlow to work with Angela McArthur when Mr. Parker

knew they did not get along.[9] (PSMF ¶ 119–21).

There is also evidence that Mr. Parker treated female employees unfairly. For example, Ms. Harlow testified that when Mr. Parker raised his voice, it would usually be at a female employee. (PSMF ¶ 118). Furthermore, Mr. Hafford admitted that Mr. Parker targets women more than men, because he thinks "he can bully" them and perceives them as weak and submissive. (PSMF ¶ 101).

For purposes of summary judgment, this Court cannot weigh the credibility of witnesses and must assume the events happened.[10] See Santiago–Ramos, 217 F.3d at 55. Although this is not in this Court's view the strongest case of sex-based bias, there is sufficient evidence for the jury, viewing all facts in a manner most favorable to Ms. Harlow, to find that Mr. Parker harbored discriminatory animus towards Ms. Harlow because of her gender.

### b. "Cat's Paw" Analysis

The analysis does not, however, stop there. To defeat the Postal Service's motion, Ms. Harlow must produce probative evidence that the final decisionmakers— Mr. Brydon and Ms. Pointer— acted as a

---

9. When Ms. Harlow refused to work with Ms. McArthur, Mr. Hafford assigned her to work with a male employee, who performed work poorly because of lack of sleep. Ms. Harlow was reprimanded for low productivity; the male employee was not. (PSMF ¶¶ 122–24).

10. None of this evidence is unalloyed. Mr. Stewart is Ms. Harlow's shop steward and no evidence underlying his statements has been submitted. For example, other than Mr. Stewart's statement about the male employee he reported for stealing, the record contains no further information. Regarding the shirt, Mr. Parker informed Ms. Harlow he was relaying a complaint from a co-worker, and Ms. Harlow simply stopped wearing it. There is evidence Mr. Parker and Mr. Hafford re-

quired Ms. Harlow and Ms. McArthur, who did not get along, to work together in an effort to get them to work out their differences. Telling an employee not to wear a tank top to work and forcing two female employees, who do not like each other, to work together is not unequivocal evidence of sex discrimination. Mr. Hafford's comment that Mr. Parker is a "bully" is evidence of gender-based discrimination since he said Mr. Parker perceives women as more submissive and bullies them more often, but Mr. Hafford also said Mr. Parker targets people who are weaker, which (whatever else may be said about it) is not necessarily a gender-based bias.

conduit for Mr. Parker's prejudice. Ms. Harlow .can establish that the Postal Service's stated reason for her dismissal is a pretext for discrimination by showing the discriminatory motivations of a supervisor, even though the supervisor did not formally take the adverse employment action. *See Cariglia v. Hertz Equipment Rental Corp.*, 363 F.3d 77 (1st Cir.2004). Other circuits have also recognized that an employer may be held liable if the decisionmaker who discharged the plaintiff merely acted as a rubber stamp, or the "cat's paw," for a subordinate employee's prejudice, even if the decisionmaker lacked discriminatory intent. *See, e.g., Gee v. Principi*, 289 F.3d 342, 346 (5th Cir. 2002)("[W]hen the person conducting the final review serves as the 'cat's paw' of those who were acting from retaliatory motives, the causal link between the protected activity and adverse employment action remains intact."); *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1231 (10th Cir.2000) (citations omitted)("[A] defendant may be held liable if the manager who discharged the plaintiff merely acted as a rubber stamp, or the 'cat's paw,' for a subordinate employee's prejudice, even if the manager lacked discriminatory intent."); *Russell*, 235 F.3d at 227 ("[I]t is appropriate to tag the employer with an employee's age-based animus if the evidence indicates that the worker possessed leverage, or exerted influence over, the titular decisionmaker."); *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 354–55 (6th Cir.1998)("[Decisionmaker] rule was never intended to apply formalistically, and [thus] remarks by those who did not independently have the authority or did not directly exercise their authority to fire the plaintiff, but who nevertheless played a meaningful role in the decision to terminate the plaintiff, [are] relevant."); *Griffin v. Washington Convention Ctr.*, 142 F.3d 1308, 1312

(D.C.Cir.1998)("[E]vidence of a subordinate's bias is relevant where the ultimate decision maker is not insulated from the subordinate's influence."); *Llampallas v. Mini–Circuits, Lab, Inc.*, 163 F.3d 1236, 1249 (11th Cir.1998), *reh'g denied*, 178 F.3d 1305 (11th Cir.1999), *cert. denied*, 528 U.S. 930, 120 S.Ct. 327, 145 L.Ed.2d 255 (1999)("In a cat's paw situation, the harasser clearly causes the tangible employment action, regardless of which individual actually signs the employee's walking papers."); *Willis v. Marion County Auditor's Office*, 118 F.3d 542, 547 (7th Cir. 1997)("[T]here can be situations in which the forbidden motive of a subordinate employee can be imputed to the employer because, under the circumstances of the case, the employer simply acted as the 'cat's paw' of the subordinate."); *Delli Santi v. CNA Ins. Cos.*, 88 F.3d 192, 200 (3d Cir.1996)(noting an employer may be liable for the discriminatory conduct of its supervisors irrespective of the knowledge or intent of the ultimate decision-makers); *Kientzy v. McDonnell Douglas Corp.*, 990 F.2d 1051, 1060 (8th Cir.1993)("A reasonable jury could have found that [the employee] used [the decisionmakers] as the conduit of his prejudice—'his cat's paw.' "); *Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir.1990)(the "cat's paw" refers to employer liability that accrues when the employer acts as the conduit of a subordinate's prejudice). "The degree to which [the final decisionmaker's] decisions were based on his own independent investigation is a question of fact ...." *Long*, 88 F.3d at 307.

In this Court's view, this issue is controlled by *Cariglia*. In *Cariglia*, the employee argued that a supervisor, who harbored discriminatory age-based animus against him, withheld exculpatory evidence from decisionmakers and thereby his "animus impermissibly tainted the decision-

making process." *Cariglia,* 363 F.3d at 83. Although the First Circuit remanded *Cariglia* for further factual findings, it concluded an employee's termination could be "impermissibly tainted" with a subordinate's animus, if the subordinate concealed relevant information or fed false information to the neutral decisionmakers. *Id.* at 87.

Viewing the evidence in the light most favorable to Ms. Harlow, she has demonstrated a genuine issue of material fact concerning whether there is a causal connection between Mr. Parker's discriminatory animus and Mr. Brydon and Ms. Pointer's decision to remove Ms. Harlow. The version of the events Mr. Parker relayed to Mr. Brydon may have been skewed to perpetuate his discriminatory animus. Mr. Parker told Mr. Brydon only three things regarding the December 2001 incident: (1) that Ms. Harlow falsified her Form 1260 and that she was absent from the building at a time she claimed to have been working; (2) that he had an earlier discussion with Ms. Harlow about similar incidences; and, (3) that he had previously talked to her about using the Form 1260 in lieu of a time card. He never explained that Ms. Harlow had taken her lunch break at a different time than shown on the Form 1260 and that she had actually worked the number of hours indicated on the Form.

Based on this filtered information, Mr. Brydon concluded Ms. Harlow's actions constituted a "theft of time." Mr. Brydon then relayed this truncated information to Ms. Pointer. Neither Mr. Brydon nor Ms. Pointer conducted an independent investigation of the events, but instead rather relied on: (1) the assumption her falsification of a Form 1260 was stealing; and, (2) there had been a previous, similar incident with Ms. Harlow. Neither spoke directly to Ms. Harlow.

On this record, Ms. Harlow has raised a jury question as to whether Mr. Parker, in fact, harbored impermissible gender-based animus against her and whether, if he did, this animus caused him to submit a biased report. There is also evidence for the jury to infer that Mr. Brydon and Ms. Pointer relied on Mr. Parker's representations when deciding whether and how to discipline her. In sum, whether Mr. Brydon and Ms. Pointer's decision to fire Ms. Harlow was tainted by Mr. Parker's alleged gender-based prejudice against her must be resolved by jury resolution of questions of fact. *See McDonald v. Rumsfeld,* 166 F.Supp.2d 459 (E.D.Va.2001).

## III. CONCLUSION

Defendant has failed to sustain its burden to demonstrate there are no genuine issues of material fact and its Motion for Summary Judgment is DENIED.

SO ORDERED.